ALEXANDER SCHONWALD V. F. BURKART MANUFACTURING COMPANY, a Corporation, Appellant.—No. 39708.—202 S. W. (2d) 7.

Division One, April 21, 1947.

Rehearing Denied, May 12, 1947.

436

*Rassieur, Kammerer, Rassieur & Erker* and *Samuel H. Liberman* for appellant.

438

*Wilbur B. Jones, Peter H. Husch,* and *Dave L. Cornfeld* for respondent; *Salkey & Jones* of counsel.

HYDE, J.—This is an action for damages for breach of contract. Plaintiff obtained a verdict for $109,664.68. Defendant has appealed from the judgment entered.

Defendant contends that plaintiff failed to make a case for the jury. The following facts appear from a consideration of the evidence from the view most favorable to plaintiff. Late in 1942, the use of leather was restricted by the United States Government because of war needs. Leather shoes were rationed early in 1943 and the shoe industry began to look for substitutes for leather and rubber (also restricted) to use for shoe soles for non-rationed shoes. Plaintiff had been in the shoe business for twenty years as sales representative for shoe manufacturers. He said that he began experimenting with various materials in March 1943 to develop a synthetic sole. In April, while in an eastern shoe factory, he noticed that a pyroxylin compound was used to cement shoe soles to uppers. He decided to experiment with

it for the purpose of laminating materials, other than leather, to get the necessary thickness for shoe soles. When he returned to St. Louis in May, he got some pyroxylin cement from the Compo Shoe Machinery Company which manufactured it under the name of Compo Cement. He began experimenting with a few yards of cotton duck, which he had obtained from a tent company. He made these experiments in the basement of the apartment building where he lived, dipping pieces of the material into pans of pyroxylin, hanging them up to dry; then putting a weaker pyroxylin solution on them and sticking them together under pressure with a hand press which he bought from a bookbinding supply company. He found that he was able to get a successful lamination of three thicknesses of canvas which would have the proper thickness and strength for use as a shoe sole. Plaintiff learned that pyroxylin was composed of materials not essential to the war effort so that an ample supply was available. This was not true of some other kinds of cement which might have been suitable.

During the time plaintiff was working on this canvas sole he also attempted to develop a rope sole. He went to Mr. Harry Burkart, President of defendant, to see if he could purchase sisal, which is a fiber in the nature of hemp; and to see if they could weave the fiber so that it could be used for a sole. Defendant was a large user of sisal in connection with its fiber upholstery business, for automobiles, mattresses and furniture, which was its principal business. However, he found that sisal was also restricted because of war use. In his conversation with Mr. Burkart concerning his proposed rope sole, plaintiff also mentioned his laminated duck sole. Mr. Burkart was very much interested and wanted to know about it. Plaintiff said that he would tell him about it if he promised to make it exclusively for him. Mr. Burkart said he could not promise to manufacture it, but if they did make it, they would make it only for him. Plaintiff then came back the next day and showed him samples of his material. This occurred during the first week of June 1943. Mr. Burkart called defendant's production manager, Mr. R. B. Morrow, and asked plaintiff to work with him to see if they could use the material for large volume production of shoe soles. Early in 1943, defendant had undertaken to make a cloth sole for a Nashville, Tennessee, company, using lighter cloth and a different type of cement, laminated under heat; but had never gone into production on it and had given up this project before plaintiff talked to Burknart. Plaintiff and Morrow worked for a period of about six weeks before obtaining proper lamination by his process under the conditions in defendant's factory. One trouble first encountered was that too much pressure was used by the press available there, so that it squeezed out too much of the cement, and the material would not stick. There was also difficulty in getting the best consistency of the pyroxylin and in finding how to put it on

the cloth with rollers which would spread it evenly. Pyroxylin was composed of cellulose nitrate and was very inflammable so that there was a fire hazard to be considered in the operations. Plaintiff had contacted Mr. Israel Dennis of the Dennis Chemical Company and found that he could furnish the pyroxylin required for large scale production. He introduced Dennis to Morrow, and Dennis made suggestions about the use of pyroxylin and assisted them in their experiments.

During this period plaintiff had some shoes made up with the laminated duck soles and used them as samples in contacting shoe manufacturers. About the middle of July, plaintiff and Morrow told Burkart that they were able to make satisfactory soles, and were ready to go into production. Plaintiff said that he was ready to begin selling them, and asked Burkart what they would charge him for the soles. It was intended at that time that plaintiff would buy defendant's product as a jobber and sell the soles to the shoe manufacturers. Burkart said they couldn't fix the price until they had determined their cost by making a production run. He asked plaintiff what he thought he could get. Plaintiff suggested $1.50 per sheet of a size sufficient to make four pairs of soles. Burkart suggested that plaintiff bring him an order on which they could make a production run. Plaintiff had been sampling the trade during the six weeks experimental period and immediately obtained an order for 100,000 pairs of soles, 25,000 sheets, from the Lown Shoe Company of Auburn, Maine. Burkart refused to accept this offer. He said: "After all, we don't know what this sole is. We have never been in the shoe business, and we have only your word for it that this is a good sole." He said he would not ship that much merchandise clear to Maine when it was a product he didn't know anything about, because it might either be shipped back or he might have to send men there to make adjustments. He told plaintiff to see if he could get some orders for 1000 to 1500 sheets from local shoe companies.

Plaintiff did get such local orders and after some of them were filled Burkart set a price of $1.26 per sheet to plaintiff. He asked plaintiff what he would sell them for and he told him $1.50 to larger users and $1:65 to smaller ones. Burkart and Mr. H. W. Hagnauer, vice-president and sales manager of defendant, suggested to him that it would be better to make a lower price because the demand would be greater. Hagnauer suggested that they be sold at $1.40 per sheet, and that instead of defendant selling it to him for resale, plaintiff should sell it for defendant and they would bill it and pay him 10% as commission and royalty. Plaintiff asked what the objection was to him selling it and billing it. Burkart said that plaintiff did not have the organization to do it; and Hagnauer said that production would involve a lot of money, and that it would be better for plaintiff to sell it for them. Plaintiff asked to have an agreement in writ-

ing; but Burkart said this was not necessary, saying: "You brought this to us and if it weren't for you we wouldn't be in it. We are making this for you exclusively and all you have to worry about is selling it." Plaintiff said: "Under no circumstances are you to allow anyone else to sell it or are you allowed to make it for anyone else." Mr. Burkart said: "That is right." Plaintiff said: "Well, if you agree then to only ship to customers that I sell and only manufacture it for me, I would be perfectly willing for you to bill it and I would be willing to sell it at $1.40 and 10%, under the circumstances, providing you make a lot of it." Plaintiff said they all agreed on that basis. He said he told them that he had given up his relationship with his shoe factories and would devote all his time to the sale of these soles.

Soon thereafter, defendant made an application to the OPA for approval of the price of $1.40 per sheet. This letter states "that we have never made anything of a ▮▮▮ similar nature" and further stated:

"The above price was arrived at in the following manner:

| | |
|---|---:|
| Canvas (based on $ .36 per yard for 30″ goods) ....$ | .3587 |
| Adhesive (based on $1.45 per gallon) ............ | .3840 |
| Packing materials and supplies ................. | .0150 |
| Curing and drying charge ....................... | .0500 |
| Direct labor ................................... | .1000 |
| Overhead ...................................... | .2497 |
| Total Manufacturing Cost .......................$ | 1.1574 |
| Selling Expense ............................... | .1400 |
| Profit ........................................ | .1026 |
| Proposed Selling Price ....................$1.40 per sheet." | |

Plaintiff obtained orders from the Brown Shoe Company and the International Shoe Company, of St. Louis, both of which began in a short time to use large quantities of the soles. He also obtained substantial orders from several other shoe companies, some located in St. Louis and some in other cities. During the early part of September, 1943, Burkart told plaintiff that he had decided to allocate the entire production to Brown and International, until defendant could straighten out certain production problems and get its production up to a point where plaintiff could go out and sell to other companies. About the same time, Hagnauer told plaintiff that they would increase their production substantially so that they could take on some business they had turned down but said that they had decided to reduce his commission from 10% to 5%. Plaintiff protested but, after September, defendant sent plaintiff remittances for commissions only on the basis of 5%. Hagnauer told him 10% was too much on the product and more than the trade could stand. How-

ever, defendant continued to sell the soles at the same price of $1.40 per sheet. The price was reduced to $1.35 in August 1944. Defendant's total sales had reached $1,251,263.14 by April 1945.

About the same time that his commission was thus reduced, plaintiff heard that Mr. Engle of the John Harvey Leather Company was also selling these soles. When plaintiff protested, Burkart first denied this and said that he had only asked Engle to have them tried out by other companies to see how good they were. Plaintiff told Burkart that the reason he did not want anyone else to sell the sole was that it required knowledge, not only of the make-up of the sole itself, but of the proper methods of cutting, handling and using the sole in the shoe factory to get good results; and that anyone who did not understand the shoe business thoroughly and who did not take the trouble to explain these methods to shoe manufacturers would harm the sale of the product. Finally, however, Burkart said that Engle had made a sale to one company because the president of the company did not want to do business with plaintiff. Defendant's later advertising material lists the John Harvey Leather Company as distributors and the testimony was that this company and its agents were defendant's only distributors of the sole. In December 1943, Burkart told plaintiff that he was going to make Brown and International house accounts, beginning January 1, 1944, and would not pay plaintiff any commission on sales to them on orders taken after that date. He also told plaintiff that he expected to get into big production in a new plant after the first of the year and that he would notify plaintiff when he could begin selling to other accounts. However, plaintiff was never authorized to make any more sales and was unable to see Burkart after December 1943. This suit was commenced in July 1944, and was tried in May 1945. It has been delayed on appeal by illness of the court reporter.

Defendant's evidence was that pyroxylin was a well known and much used cement made by many companies. It was shown that a patent had been issued in 1894 on a method of laminating fabric with pyroxylin to make collars. It was also shown that some other companies were making laminated cloth soles prior to June 1943, although some of them (Tobo and Schlosberg) used a different type of cement. Burkart testified that when plaintiff first came to see him he showed him a piece of laminated duck which he said was being made by other firms; that he asked if defendant could make it and said he would like to job it; that he said he could show him how it was laminated; and that, when plaintiff and Morrow first experimented and failed to make it stick, plaintiff said he would go down town and get more information about laminating the material. Defendant also had evidence that one firm, Corlea Shoe Company, which originally made corrugated leather soles, began making duck soles laminated with pyroxylin in March 1943; and that plaintiff was acquainted with one

of the owners and had been in their factory and seen their process in operation prior to June 1943. Plaintiff admitted that he had seen shoes with cloth soles in stores prior to June 1943 but said that he did not know how they were made nor what kind of adhesive had been used.

It appeared that there were about twenty-five different weights of cotton duck; and in this connection, one of the officers of the International Shoe Company, who was called as a witness by defendant, said that he had seen substitute soles prior to June 1943, "but none that we would have any confidence in." It also appeared that representatives of the International Shoe Company and the Brown Shoe Company worked with Mr. Morrow throughout 1943 to give him the benefit of their experience in the use of the soles sold to them, and to assist in perfecting defendant's process of manufacturing them. Burkart testified that it was plaintiff who made the proposal to sell for defendant on a commission, saying he didn't have the organization for jobbing it. Hagnauer said that plaintiff only asked that his commission be continued on a 10% basis until he had sold 20,000 sheets, which was done. Both of them said that, in December 1943, they told plaintiff that he would not be paid on Brown and International business ordered after January 1, 1944, and admitted that he protested and later demanded this commission. They denied that any agreement was ever made that plaintiff was to be the exclusive salesman for the soles. The total amount of commissions actually paid to plaintiff was $15,461.63 which was all on orders procured by him prior to January 1, 1944.

Defendant contends that plaintiff is not entitled to recover because he did not originate the idea and process. Defendant also contends that the alleged contract was unenforceable because of indefiniteness, uncertainty and lack of mutuality; and that it was terminable at will because it was a contract of employment with no agreement as to its duration. Defendant's argument is that the process was not new and novel; and that no one can have any proprietary interest in ideas well known to others. Defendant says that plaintiff's evidence shows that he did not conceive and develop either new ingredients for making laminated cotton duck soles, or a new method of achieving lamination, or a new use for the laminated product. It says that sheets of such cloth and pyroxylin were used as ingredients in lamination of shoe soles before plaintiff came to Burkart with this process; that the method of lamination with these ingredients had long been known and was described in the 1894 patent; and that there was no novelty or originality in the use of cloth laminated with pyroxylin for shoe soles. Defendant cites Brunner v. Stix, Baer and Fuller, 352 Mo. 1225, 181 S. W. (2d) 643, and the cases exhaustively reviewed by this court therein, which are also relied on by plaintiff. Therefore, we must decide the application of those authorities to the facts of this case.

Ideas have been compared to fera naturae, property rights in which are dependent on possession and are lost by escape of a wild animal and likewise by disclosure of an idea. Ideas have also been compared to legal tender or negotiable instruments because title passes by delivery which is like disclosure of an idea. [Legal Protection of Ideas—Logan, 4 Mo. Law Rev. 239.] Of course, there can be no property right in a mere abstract idea, but there may be "in a particular combination of ideas or the form in which ideas are embodied." [Fendler v. Morosco, 253 N. Y. 281, 171 N. E. (2d) 56.] Surely when ideas are embodied in a concrete plan for accomplishing a definite result, the one who ▮▮▮ has conceived the plan has a right to contract with reference to its .disclosure and to give instructions in its use, even though he did not originate it in the sense that no one else ever had similar ideas. We think the Brunner case so holds. It is true that contracts to disclose ideas, which are widely known and generally understood, are held to have no validity. When ideas, even if called plans, are so known and understood by most people, contracts for their disclosure may well be said to be without consideration, when nothing is learned that was not already known. Examples of such cases are Soule v. Bon Ami Co., 195 N. Y. S. 574, affirmed 235 N. Y. 609, 139 N. E. 754, where the idea for increasing profits was merely to raise prices; Masline v. New York, N. H. & H. R. R., 95 Conn. 702, 112 Atl. 639, where the idea for income was only to use space in cars, stations, etc. for posting advertising matter; and Taylor v. Commissioner of Internal Revenue (C. C. A. 3rd), 51 Fed. (2d) 915 where it was contended that a certain plan for advertising was an exhaustible asset for which an allowance for wear, tear and exhaustion could be made for tax purposes; which the court designated as an idea, theory or system and said "could not be subject to ownership in the legal sense any more than the multiplication table." [See Annotations 104 A. L. R. 1357; 157 A. L. R. 1436; also 18 C. J. S. 147, Sec. 12; See also 1 Williston on Contracts 391, Sec. 115 for comment on the above cited cases.] Nevertheless, while no one could have any property right in the multiplication table, surely a valid contract could be made to teach the multiplication table.

▮ Plaintiff's agreement was not merely to disclose an idea to defendant. The abstract idea of making shoe soles from canvas was stated to Burkart by plaintiff before there was any agreement. Defendant's own evidence shows that Burkart had never been in the shoe business; that defendant's manufacturing business was in other fields; that it had not been making anything like this for the shoe industry; that defendant's officers became very anxious to get into the business of making such soles; that they did not know of any successful method for making them; and that they requested and used plaintiff's process and his knowledge, advice and services in learning how to apply it. Thus, after the abstract idea had been

communicated to Burkart, what he wanted and received was both a disclosure of plaintiff's concrete plan for making such soles and also plaintiff's assistance in teaching defendant's production manager and employees how to use this plan for making such soles. Although the abstract idea was not new, we think that the evidence warrants a finding that plaintiff had conceived and developed a specific concrete method of his own for the use and application of this abstract idea to accomplish a definite result, namely: to use available ingredients to make a certain type of canvas shoe sole. Defendant showed that it believed this method and product was something new, useful and novel by widely advertising it as a "sensational new sole," and "an original creation," and "definitely an improvement." It is hardly in a position now to claim that the evidence conclusively shows that it was exactly the same plan and product known to and made by many others.

As we said in the Brunner case: "The case does not pivot on an unauthorized use of an asserted property right, common law or statutory, in a disclosed idea, but on a contract to pay for the authorized use of a disclosed idea. Plaintiff was under no legal obligation to make his plan known to defendant. He disclosed it in consideration of a promise given and received as the equivalent in value for its disclosure. Defendant's cases recognize, we think, the disclosure of a new and useful idea, or one thought to be useful, may be protected by a contract." Certainly, when we have the additional factor, as in this case, of the use of plaintiff's services (which covered a period of six weeks) in instructing defendant how to put this plan in operation to manufacture such soles on a mass production basis with the machinery and equipment it had available, we have proper subject matter for protection by contract. It was certainly new and useful to defendant because it had ▆ never made such a product and because (also according to its advertisements) it sold over 1,500,000 pairs in less than two years after commencing production. It must not be overlooked that time was of the essence of the matter. If defendant was to benefit from plaintiff's plan, it was necessary to act quickly and move fast. There was an enormous immediate demand from the shoe industry for soles which could be used on non-rationed shoes. This demand would only last during the emergency period of war-time shortages and rationing. Defendant's officers saw the profitable possibilities in this and the evidence certainly warrants the finding that it immediately seized the opportunity to use plaintiff's plan, and his services to facilitate its use, upon the terms he stated. Upon the authority of the Brunner case, we hold that the disclosure and use of plaintiff's plan and his services was the proper subject matter of a valid contract.

▆ Defendant's contentions as to indefiniteness, uncertainty and lack of mutuality are that the original contract bound defendant to

make and sell the product to plaintiff but did not fix any price and did not bind plaintiff to purchase; that the modified agreement had no consideration other than the abandonment of the original unenforceable contract; and that even the modified agreement likewise bound the defendant to pay commissions to plaintiff but did not bind the plaintiff to do anything. However, we think that defendant confuses negotiations with contracts. There was an agreement for plaintiff to disclose his process and instruct defendant in its use upon defendant's promise that it would make the soles only for plaintiff if it decided to make them. While no price was agreed upon, this surely meant a reasonable price based upon defendant's costs. (Whether a contract to compensate plaintiff could be implied, if defendant had then appropriated it, is not before us.) However, at this stage, it was defendant that was not bound to do anything; but plaintiff had already given it valuable consideration for its anticipated promise, by his disclosure of his process and his services in assisting defendant to prepare to make the product. Plaintiff was really in the position of making a continuing offer to defendant; and it had the option of accepting it, if it decided as a result of the experiments, being made by plaintiff and its production manager, that it could make the product profitably. After it found that plaintiff could sell them, defendant agreed to make the soles at a definite price which plaintiff accepted. Then defendant proposed that it should be the seller of the product, rather than making soles to sell to plaintiff for resale by him, with the offer to pay him 10% of the selling price on all sales. This is the contract sued on (with some further argument as to whether or not plaintiff was to be the exclusive selling agent) and prior negotiations were merged into it. The doctrine of mutuality really is "another mode of stating the rule of consideration that where there is no other consideration for a contract, the mutual promises must be binding on both parties, for the reason that only a binding promise is sufficient consideration for a promise of the other party." [12 Am. Jur. 511, Sec. 13.] Therefore, "mutuality of obligation is not required where there is other consideration than a promise." [12 Am. Jur. 609, Sec. 114.] We think it is clear that plaintiff gave ample consideration for the contract sued on, and that the contract finally made was sufficiently definite and certain.

Neither is there any merit in defendant's contention that plaintiff's contract was a contract of employment for an indefinite period which would be terminable at will. The essence of this contract was not employment. So far as defendant was concerned, the contract was not made primarily to obtain the services of a salesman; it was to obtain disclosure of the process for and to learn how to manufacture what was thought to be and what proved to be a valuable product. Plaintiff wanted to participate in the profits of the venture as compensation for the disclosure of his process and his as-

sistance in devising the means of manufacturing the product in defendant's factory. Of course, it was intended that plaintiff should also work at selling it. He gave up all of his other connections to devote his full time to it. Neither party could make any profit unless there were sales aand no one but plaintiff did any selling at the start. It soon became apparent that defendant could not (at least for some time) fill the orders plaintiff could get. But his services in selling were only incidental to the main purposes of the contract. The circumstances also clearly show that this was not expected to be a contract in perpetuity. The sole was a war-time substitute. It could only be sold profitably during the period of shortages and rationing and this set limits on the duration of the contract. Furthermore, independent and additional consideration, other than services to be rendered, prevents even an employment contract from being terminable at will. [See Fullington v. Ozark Poultry Supply Co., 327 Mo. 1167, 39 S. W. (2d) 780; 35 Am. Jur. 461, Sec. 25.] We hold that the contract sued on was not terminable at the will of defendant. We, therefore, hold that the court properly refused to direct a verdict for defendant.

 Defendant further contends that the court erred in refusing to admit evidence that defendant had, before the disclosure of plaintiff's process, laminated fabrics (including duck) by the use of adhesives (including pyroxylin) for making various articles such as shell noses, glider noses, booster cups, scabbards, suit cases, and wall panels. However, even if such evidence be regarded as relevant, "it does not follow that its exclusion constituted reversible error, this because the admission of collateral matters tending indirectly to prove a controverted issue, is largely discretionary with the trial court." [Brunner v. Stix, Baer & Fuller, supra.] We, therefore, hold that there was no prejudicial error in the exclusion of this evidence.

 Defendant also alleges error concerning instructions. It contends that instructions 1 and 2 directed a verdict on a contract and breaches not pleaded and omitted findings of essential elements of the contract and breach pleaded. It says that plaintiff's alleged contract was to perform services as the exclusive selling agent for defendant and that instruction 1 did not include a finding that plaintiff was to have the exclusive selling agency and did not indicate that plaintiff was to have anything to do with the sale of the soles. It also says that instruction 2 contained no requirement for a finding that plaintiff was to act as exclusive selling agent under the terms of the agreement, or that plaintiff was prevented from acting as its exclusive selling agent, or that defendant was guilty of a breach of contract in permitting others to sell the product. Defendant further contends that instructions 3, 6, 7 and 12 were erroneous because they did not require a finding that plaintiff was to have an exclusive agency for the sale of the soles as long as defendant continued to manufacture

the soles. It says that instruction 3 directed a verdict on the theory of an exclusive sales agency but omitted this requirement without which defendant argues plaintiff's contract would have been terminable at will. It also says that the instruction 6 (although not directing verdict) was on the theory of a breach of an exclusive sales agency contract; that there could be no such breach if terminable at will; and that it was so terminable unless the contract was found to be for some fixed duration. It further contends that instructions 1, 2 and 7, which are based on the breach of a contract to pay royalties (without reference to who made the sales), are in conflict with instructions 3 and 6 based on breach of a contract for an exclusive sales agency.

However, we think that plaintiff's proof showed (and his petition sufficiently alleged) breaches of two different provisions of the contract, namely: the provision that it would pay plaintiff 10% on all sales, agreed upon when defendant was given the right to sell and bill the soles as its own product (which we consider to be the major breach and which would alone support recovery for the entire amount sought); and the provision that no one but plaintiff should be allowed to sell them (which was the minor breach). It was shown that plaintiff's reason for wanting the latter provision was that he thought he could sell more of them by personally showing shoe manufacturers how to use them (because of his long experience) than would be done by persons without such experience. He was interested not only in original orders but also in continuously repeated orders which he thought would require service in showing how to use the soles as well as salesmanship. Of course, more sales meant more money from his ten per cent; and the evidence indicates that he was able to sell more than defendant could make. He had the right to recover if the jury found that either provision had been breached; and it was not improper to submit them separately, although it might have been better to have submitted both together in one main instruction. Nevertheless, there was an instruction limiting plaintiff's recovery to commissions on the amount actually sold by him only, if the jury found that to be the contract. Furthermore, instruction 3 did require the jury to find in addition to the exclusive sales agency "that defendant would pay to plaintiff an amount equal to 10% of *all* its sales of said product." It is apparent from the verdict for the full amount sued for that the jury did find for plaintiff on both breaches, as the evidence fully warranted. As to the contention that no finding as to the duration of the sales agency was required, we note that, in addition to the above noted requirement of instruction 3, instruction 6 required the jury to find that "defendant agreed that plaintiff was to have the exclusive agency for the sale of *all* laminated duck *soles manufactured by it*"; and instruction 7 required the finding that defendant agreed "to pay plaintiff an amount equal to 10% of *all sales of* laminated

duck *soles* for shoes *which it manufactured.''* It seems that an agency to sell all soles which defendant manufactured would be understood to mean that the agency would last as long as defendant manufactured them. While this idea might have been more clearly expressed, we think these requirements were sufficient (at least when no such objection was made at the trial) and that the jury could not have been mislead as to the issues. It was obvious from the nature of the product and the surrounding circumstances, and from all of the instructions read and considered together, that the contract was for the limited period of wartime shortages and rationing. These contentions are based on defendant's claim that the contract was merely an employment contract, terminable at will, which we have already discussed and rejected. We find no prejudicial error in these instructions.

▮ Defendant urges several objections against instruction 2. It contends that this instruction was erroneous because it failed to require a finding that plaintiff was the originator of the process; and likewise contends that the court erred in refusing its instruction C which required such a finding as the basis of recovery. Our ruling against defendant's claim of being entitled to a directed verdict on this ground also rules this contention. This is a stronger case for the plaintiff than was the Brunner case, both because plaintiff herein never disclosed his process to anyone except defendant and because part of the consideration herein was plaintiff's services in assisting defendant to learn how to use his process in its plant to make the product in large production.

· Defendant also contends that instruction 2 was in conflict with instruction 4 because it told the jury ''that defendant cannot escape the legal liability to compensate the plaintiff in the manner and in the amount so agreed upon by contending or showing that the said idea, process, or information so disclosed and furnished, *was also known or being used by others''*; while instruction 4 (given at defendant's request) told them they could not find for plaintiff if they found ''that the idea and process claimed to have been disclosed by plaintiff to defendant *was commonly and widely known before such disclosure.''* We think the distinction is obvious for the reasons discussed supra in overruling defendant's claim that it was entitled to a directed verdict.

▮ Defendant further complains of a part of instruction 2 which authorized a verdict for plaintiff upon the finding in part. as follows: ''that the plaintiff in June of 1943 disclosed to the defendant an idea and process for the manufacture of non-rationed laminated duck soles for shoes, and that said idea and process were useful and new to the defendant, . . . (that the defendant received from the plaintiff information or advice with respect to a method for the manufacture of such laminated duck soles *under dealings and circumstances which*

*established an agreement* between the said parties that if, after studying and testing the said idea and process, the defendant should find that it could make said soles, defendant would manufacture the same exclusively for plaintiff,) . . . that said agreement was later modified by ▮ mutual consent of the parties to provide that, in return for the right and privilege of manufacturing, shipping and billing said product as its own property and on its own account and under its own name, the defendant would pay the plaintiff a fixed percentage of the amount of its gross sales of said product." Defendant says that the part in parenthesis, particularly the italicized portion, authorized the jury to find an agreement implied from facts and circumstances and allow recovery upon it instead of on the express contract sued on. Here again defendant confuses the continuing negotiations with the final contract which is the basis of this action. We hold that the basis of recovery is made plain by the parts of the instruction, above set out, preceding and following the part about which defendant complains. We, likewise, find no merit in defendant's contention that the first part of this portion of the instruction erroneously authorizes the jury to find as consideration for the alleged agreement the receipt by the defendant from the plaintiff of "information or advice with respect to a method for the manufacture of such laminated duck soles," when the consideration pleaded was plaintiff's disclosure of his process, because we have held that such information and advice was a part of the consideration. This was within the facts pleaded and the disclosure was also included in the submission.

▮ Defendant further contends that this part of the instruction argumentatively stated abstract principles of law and did not tell the jury what facts must be found in order to reach a verdict, but gave the jury a roving commission to decide the question of law as to whether or not an agreement was established between the parties, citing Lewis v. Zagata, 350 Mo. 446, 166 S. W. (2d) 541; and Gillioz v. State Highway Commission, 348 Mo. 211, 153 S. W. (2d) 18. This instruction considered as a whole is very different from those found to be subject to this criticism in the cases cited. We hold that it sufficiently hypothesized the facts essential to a finding for plaintiff. [See the instruction held sufficient in Brunner v. Stix, Baer & Fuller Co., supra.]

▮ As the jury was leaving the court room, after submission of the case, a juror said to the judge: "I want to ask you a question. Do I understand that nothing is to go on after this, that this year and next year are out?" The Judge replied, "That's right." Defendant complains of this as an oral instruction, in violation of Section 105 of the Code of Civil Procedure. (Sec. 847.105 Mo. Stat. Ann.) However, after the court informed counsel of this incident no objection or request of any kind was made as required by Section 122 of the Code.

(Sec. 847.122) Defendant says that we should consider this, and its complaints concerning instructions not raised at the trial, under our Rule 3.27 as plain errors affecting substantial rights. We have considered and discussed all of defendant's contentions but do not consider this to be a proper case for the application of that rule. We think the case was well and fairly tried and feel that the jury was justified in believing that defendant was very anxious to obtain the disclosure of plaintiff's process and the immediate right to make the product; that it used plaintiff's services in learning how to promptly put it in mass production and in finding out how well it would sell; and that when it found out how profitable the product would be it arbitrarily first reduced payments to him, then ceased to pay him anything on the two accounts which were taking almost all of its production and also turned the distribution of the product over to some one else. We, therefore, see no manifest injustice in the result.

The judgment is affirmed. All concur.