**MID–AMERICA MARKETING CORPO-
RATION, Plaintiff and Respondent,**

v.

**DAKOTA INDUSTRIES, INC. and La-
Maur, Inc., Defendants and Appellants.**

**No. 12085.**

Supreme Court of South Dakota.

July 5, 1979.

Rehearing Granted Aug. 16, 1979.

David V. Vrooman, Sioux Falls, David J. Vickers, of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for plaintiff and respondent.

Deming Smith, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, Charles A. Mays, of Leonard, Street & Deinard, Minneapolis, Minn., for defendants and appellants.

WOLLMAN, Chief Justice.

In an action by plaintiff-respondent Mid-America Marketing Corporation for dam-

ages for the unauthorized disclosure and use of a trade secret in breach of confidence and implied contract, the jury found for respondent in the amount of $270,000, of which $20,000 represented an award of punitive damages. This is an appeal by defendants-appellants Dakota Industries, Inc. (Dakota) and LaMaur, Inc. (LaMaur) from that judgment. We reverse.

Respondent's founder, Anthony Bachmeier (Bachmeier), has been associated with the beauty industry since 1959. In late 1974, Bachmeier and others struck upon an idea to improve the design and function of electrically heated bonnets used in the industry to facilitate the chemical processing of human hair. In December 1974, Bachmeier took an electrically heated cap manufactured by the TIZ Company to Dakota and discussed with them his ideas concerning improvements in the design of the cap. Bachmeier knew nothing of electrical design or theory and Dakota knew nothing of human hair processing or the theories thereof. Bachmeier indicated that the bonnet should be larger than the TIZ model and should fit snugly about the face in order to block out the outside air; that the material should be lightweight and feminine; that the temperature in the bonnet should be 180° (a figure arrived at by measuring the operating temperature of a hair processing device manufactured by Helene Curtis Co.); and that the heat should be uniformly distributed throughout the interior of the bonnet. Dakota suggested that a snowmobile suit hood manufactured by Dakota would be a good basis for the bonnet. Bachmeier agreed. At the conclusion of this initial meeting, Dakota committed itself to producing a working prototype of the bonnet. No non-disclosure agreement was signed by the parties; however, Bachmeier did inform Dakota that he did not want his idea "spread around town."

Dakota then dismantled the TIZ cap to determine the method by which the heating circuitry had been produced. Following this examination, Dakota procured a heating pad, removed the heating elements (consisting of resistance wire, thermostat, control switch and power cord), and placed them intact into a snowmobile suit hood. The first prototype bonnet was delivered to Bachmeier on January 13, 1975, at which time he signed a receipt stating that the "design etc. [was] proprietary to Dakota Ind. subject to release for engineering development, funding."

Subsequent prototypes produced by Dakota incorporating suggestions made by Bachmeier and others convinced Bachmeier that they were making progress toward a marketable product. Therefore, on February 18, 1975, respondent gave Dakota $10,000 as advance payment toward 1,000 of the bonnets to be known as the ThermoChem Processing System. On February 21, 1975, Dakota and respondent entered into an agreement that provided that Dakota would produce the bonnets and would sell them only to respondent and that respondent would buy them only from Dakota. This agreement also acknowledged that Dakota had developed the ThermoChem Processing System with the advice of respondent. Dakota has never returned respondent's $10,000 nor has it delivered any bonnets to respondent. On March 19, 1975, respondent received by assignment from Bachmeier and others all interests held by them in the electrically heated bonnet. Respondent did not receive an assignment of any interest held by Dakota.

Beginning in February 1975, respondent began holding demonstrations of the ThermoChem Processing System throughout South Dakota and Iowa. Prototypes were given to various beauty salon operators as a method of gaining experience in the actual operation of the device. No particular attempt was made to maintain secrecy. During the first week of March 1975, respondent's employees attended a national beauty trade show in Chicago, Illinois. Respondent's ThermoChem Processing System was on public display and demonstrations of its operation were given. Vic Born, Inc., a regional sales representative organization, was engaged by respondent to solicit orders for the ThermoChem Processing System; a prototype of the device was given to Born and was never returned. In conjunction

with the Chicago show, respondent prepared brochures and purchased advertising which pictured the ThermoChem Processing System. These pictures and accompanying text disclosed all of the unique features of the ThermoChem Processing System (its size, feminine appearance, close fit about the face, purpose, ability to retain moisture and maintain constant, even heat) except the details of its electrical circuitry and construction, about which respondent had no knowledge.

At the Chicago show, respondent made its first contact with LaMaur. As a result of LaMaur's interest in the ThermoChem Processing System, respondent withdrew the prototypes from public display. On March 2, 1975, LaMaur signed a memo indicating interest in acquiring exclusive rights to distribution of the ThermoChem Processing System. (This memo does not indicate from whom these rights were to be acquired. It was,' however, signed by Bachmeier and another of respondent's stockholders but not as agents of respondent.) LaMaur invited Bachmeier to demonstrate the ThermoChem Processing System at another beauty industry show in New York City in mid-March 1975; simultaneously, respondent displayed the ThermoChem Processing System at still another show in Iowa.

Negotiations between respondent and LaMaur did not lead to a contract. Following this breakdown, LaMaur began negotiations with the KAZ Company to produce a hair processing bonnet that would incorporate the ideas openly disclosed by respondent—namely, full head coverage with heat and moisture control. Neither KAZ nor LaMaur, nor for that matter respondent, possessed the technical expertise developed by Dakota to actually construct an appropriate bonnet. Therefore, KAZ had to start at the beginning with original engineering. When Dakota approached LaMaur, as discussed infra, LaMaur realized that a marketable product could be procured from Dakota much sooner than from KAZ; hence, the contract with KAZ was terminated.

Respondent meanwhile decided to undertake national distribution of the ThermoChem Processing System through its own network of sales representatives. Several of these representatives handled LaMaur's beauty product line and there was evidence that respondent became aware of these representatives through its negotiations with LaMaur. To establish this distribution network, respondent on May 2, 1975, entered into a contract with Dakota whereby Dakota agreed, among other things, to sell ThermoChem Processing Systems only to respondent and respondent agreed to produce orders for 12,500 ThermoChem Processing System units each calendar quarter. Dakota's project manager testified that by calendar quarters they meant each ninety days beginning May 2, 1975. Respondent produced no testimony to challenge this understanding. Respondent did not possess sufficient financial resources to underwrite the credit of cosmotologists ordering the bonnets; therefore, Dakota agreed to underwrite that risk for those customers Dakota found to be credit worthy and that only those orders would count against the 12,500 units respondent was required to sell each quarter in order to avoid default on the contract.

Pursuant to this contract, from May to July of 1975 respondent submitted orders to Dakota for 3,632 units. Of these, only 930 were deemed to be credit worthy by Dakota; however, none of these orders were filled.

On May 23, 1975, respondent and Dakota met and decided that Dakota should attempt to reestablish the negotiations with LaMaur. Respondent attempted to place the following restrictions upon Dakota's negotiation with LaMaur: no agreement was to be reached during the initial meeting; LaMaur was not to be granted exclusive distribution rights; respondent was to be relieved of any obligations to sales representatives; price of the units was not to be discussed; and technical aspects of the ThermoChem Processing System were not to be revealed. The record reveals an unsupported statement by Bachmeier that Dakota agreed to these restrictions. On May

27, 1975, Dakota and LaMaur met and conferred. An agreement in principle was reached at this meeting. On May 29, 1975, Dakota submitted a proposed agreement to LaMaur and turned over to LaMaur the orders for ThermoChem Processing Systems that respondent had placed with Dakota. LaMaur submitted a counter-offer on June 13, 1975; this offer called for respondent's consent to the agreement but did not make respondent a party to the contract and made no provision for respondent's compensation.

On June 20, 1975, Dakota submitted a contract to respondent intended to supplant the May 2 agreement. Under this proposal respondent would receive 18% of all revenues on sales of bonnets made by Dakota and sold to LaMaur. This offer also required respondent to consent to the June 13 contract between Dakota and LaMaur. Along with this new contract, Dakota provided respondent a copy of Appendix A to the contract between appellants, which purports "[t]o identify the proprietary aspect of the Electric Bonnet Processing System, Dakota Industries Inc. Part No. 57822." The document also describes all the materials and assembly steps required to produce a bonnet. There is no discussion of how the system works or how it should be used in the processing of human hair. Respondent rejected this offer.

Dakota submitted "Appendix A" to LaMaur on June 20, 1975, and LaMaur committed itself, through issuance of an internal "merchandising decision" memorandum, to sell the bonnet. Respondent submitted counter-offers to Dakota on July 2 and 9, 1975, both of which were rejected because they would have allowed respondent to produce processing systems in competition with the ThermoChem Processing System.

On July 25, 1975, appellants entered into a written agreement for Dakota's manufacture and LaMaur's sale of the bonnet. A two-party contract, it made no provision for respondent. Dakota justified its course of action as necessary to protect its substantial investment because of the intractable stance respondent had assumed in negotiations, because Dakota knew that LaMaur was going forward with a bonnet and would if necessary purchase one from a competitor, and because it believed the May 2 contract to have been breached through respondent's inability to sell 12,500 units during the first ninety days. During July and August 1975, Dakota sold 18,939 units to LaMaur. LaMaur's sales dropped dramatically after the first month, however—in fact returns exceeded sales—and LaMaur wound up with net sales for the first year of only 12,707 bonnets. Neither Dakota nor LaMaur has ever paid anything to respondent as compensation for its interest in the bonnet. No bonnets have ever been delivered to respondent nor has Dakota returned respondent's $10,000 advance payment.

The Restatement of Torts § 757 (1939) provides:

> One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
>
> (a) he discovered the secret by improper means, or
>
> (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or
>
> (c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or
>
> (d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake.

It is apparent that respondent must prove that it indeed had a trade secret in order for liability to attach under this theory.

Trade secrets have been found in a wide variety of subjects, including but not limited to: chemical formulas, *Platinum Products Corp. v. Berthold*, 280 N.Y. 752, 21 N.E.2d 520 (1939); industrial processes, *Sun Dial Corp. v. Rideout*, 29 N.J.Super. 361, 102 A.2d 90 (1954), aff'd 16 N.J. 252, 108 A.2d

442 (1954); pricing information, *Simmons Hardware Co. v. Waibel*, 1 S.D. 488, 47 N.W. 814 (1891); customer lists, *Town and Country House & Homes Serv., Inc. v. Evans*, 150 Conn. 314, 189 A.2d 390 (1963); and sources of supply, *Water Services, Inc. v. Tesco Chemicals, Inc.*, 410 F.2d 163 (5th Cir. 1969). See generally E. Kintner, *An Intellectual Property Law Primer* (1975). The numerous situations in which trade secrets might arise militates against a set definition of a trade secret.[1] Restatement of Torts § 757, comment *b* (1939), however, provides a widely relied upon definition of a trade secret. See *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). The comment states:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

*Secrecy.* The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement of Torts § 757 at 5–6 (1939). These guidelines emphasize processes that are used in a business to produce products. It is the knowledge of these processes that gives the holder of that knowledge a competitive advantage over those without that knowledge.

■ Respondent through Bachmeier had knowledge of a process that would give

---

1. For a detailed discussion of the elements and the defenses involved in trade secret litigation see M. Hutter, *Trade Secret Misappropriation:* A *Lawyer's Practical Approach to the Case Law*, 1 Western New England L.Rev. 1–45 (1978).

superior results in the treatment of human hair. This process dealt with controlling the heat and moisture for a specified time with specified chemicals when giving beauty treatments. Respondent tacitly acknowledged the nature of its trade secret in paragraph VI of its complaint. "That in late 1974, Plaintiff confidentially contacted Dakota and disclosed to Dakota its trade secret, namely the invention, use and application of the System." It cannot seriously be argued that respondent invented the electrically heated cap to be used in the treatment of human hair inasmuch as Bachmeier brought an existing model to his first meeting with Dakota.

Dakota developed knowledge of a process that would produce an electrically heated bonnet. This knowledge was contained in "Appendix A" and dealt with fabric and insulation weights, stitch sizes, pattern shapes, electrical diagrams, etc. This knowledge gave Dakota a clear advantage over its competitors, for when LaMaur learned that this knowledge could be used in its behalf through employing Dakota, it terminated the KAZ Company's effort to produce a similar bonnet. Dakota took steps to protect the secrecy of this process, for when respondent intended to deliver three bonnets to LaMaur for testing, Dakota instructed respondent to inform LaMaur that the bonnets were not to be disassembled and were to be used for temperature testing only. Respondent took no steps to protect its knowledge of how the bonnet was to be used but instead freely disclosed this knowledge to others, including LaMaur.

In this case it is clear that the bonnet is not the secret; the secret relates to the production of the bonnet in the case of Dakota and the use of the bonnet in the case of respondent. This is not to say that a product can never be a secret. For example, in *K & G Oil Tool & Service Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782 (1958), plaintiff produced a magnetic tool for fishing broken bits out of oil wells. Plaintiff leased these tools to defendant under an agreement which provided that defendant would not disassemble the tool and thereby learn how it was made. Plaintiff recovered damages and was granted an injunction after a jury determination that defendant could not have produced the highly similar tool it began to manufacture without disassembling plaintiff's tool.[2]

There is no evidence in the present record from which the jury could find that the appellants singly or in concert wrongfully appropriated respondent's trade secret. Appellants' motion for a directed verdict on respondent's first cause of action should have been granted.

■ Respondent's second cause of action alleged a breach of an implied contract. Respondent's theory on this cause of action was that because Dakota and LaMaur knew that respondent had an interest in the bonnet when they met, they were under an obligation to provide for respondent's interest. At the conclusion of respondent's case, appellants moved for a directed verdict on the second cause of action, arguing that the May 2, 1975, contract between respondent and Dakota included within its terms the transaction complained of by respondent and therefore the theory of implied contract would not lie. Appendix B, paragraph three of that contract provides:

---

2. From the facts presented in this case, it is doubtful that any of the parties could successfully establish the existence of a trade secret in the bonnet. As noted by Professor Alexander in his work on commercial torts:

[F]or a combination of features to be protected as a secret, it must be more than a mere aggregation of well known parts, even if the parts had not previously been assembled in the manner in which the "secret" combination has been put together.

G. Alexander, Commercial Torts § 3.2 at 209 (1973). Here, respondent took an existing elec-

trically heated bonnet to Dakota and told Dakota the temperature it wanted based on another hair-processing system; the chemical treatment and protective liner came from other sources; Dakota took an existing snowmobile hood, heating elements from a heating pad, and temperature controls from a third manufacturer to create the prototype bonnet. These facts militate against a finding of a protectible trade secret in the bonnet. See also *Nickelson v. General Motors Corporation*, 361 F.2d 196 (7th Cir. 1966).

In the event this agreement is terminated by either party for any reason and Dakota continues to produce and market the processing system or Mid America continues to produce, have produced, or market any similar systems (as qualified by paragraphs 10.0 through 10.3) the mutual parties hereby agree to pay commissions respectively to each other on a schedule consisting of five percent (5%) of the first two-hundred-fifty-thousand dollars; of three percent (3%) of the next four-hundred-thousand dollars and of two percent (2%) of all remainder for as long as either party manufacturers [sic], markets, or sells this product.[3]

Respondent argues that this paragraph became inoperative when a third party—La-Maur—became involved. We do not find this argument persuasive. For the provision to have any meaning at all, the parties must have contemplated the possibility that Dakota would market the processing system to a third party. As this court stated in *Werre v. Northwest Thresher Co.*, 27 S.D. 486, 490, 131 N.W. 721, 722 (1911):

> There is no question but what, where there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or suit on quantum meruit. *Ball v. Dolan*, 21 S.D. 619, 114 N.W. 998, 15 L.R.A. (N.S.) 272. Under such circumstances the suit upon such transaction must be based on the contract alone . . . .

See also *Thurston v. Cedric Sanders Co.*, 80 S.D. 426, 125 N.W.2d 496 (1963).

When "parties stipulate in a contract what the consequences of a breach of the agreement shall be, such stipulation if reasonable is controlling and excludes other consequences." 17 Am.Jur.2d Contracts § 522 at 1009 (1964). Or, as stated by the Supreme Court of Washington in *United Glass Workers' Local No. 188 v. Seitz*, 65 Wash.2d 640, 642, 399 P.2d 74, 75 (1965):

This court is committed to the view that, when parties to a contract foresee a condition which may develop and provide in their contract a remedy for the happening of that condition, the presumption is that the parties intended the prescribed remedy as the sole remedy for the condition, and this presumption is controlling where there is nothing in the contract itself or in the conditions surrounding its execution that necessitates a different conclusion.

The record provides no evidence from which the jury could determine that the May 2, 1975, contract between respondent and Dakota was not a valid, enforceable expression of the intent of the parties. It was error to refuse to direct a verdict on respondent's second cause of action.

The judgment is reversed, and the case is remanded to the circuit court for entry of judgment dismissing respondent's complaint.

MORGAN, J., concurs.

FOSHEIM, J., concurs specially.

DUNN and HENDERSON, JJ., dissent.

FOSHEIM, Justice (concurring specially).

The relationship between plaintiff and Dakota Industries, Inc., was governed by a written agreement entered into on February 21, 1975. On May 2, 1975, the same parties made a second formal contract. As the majority opinion notes, the second agreement specifies the compensation to be paid if either party terminates the agreement and continues to produce and market the product.

The parties had a right to compromise and contract their rights and interests in the venture. There is no claim that the agreements were void or voidable and plaintiff may very well have enforceable claims based upon these express contracts.

However, having reduced their business arrangement to formal agreements fixing

---

**3.** We note that the United States Supreme Court has recently upheld the validity of contracts that grant rights beyond the protection available under federal patent law. *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979).

the rights of each, those rights and duties are precisely what they say they are. The majority opinion indicates that any suit upon such a transaction must be based on the contract alone, particularly when the condition which occurred is foreseen in the contract with a remedy provided. If that is a correct statement of the rule in this state, and I agree it is, then any remedies otherwise available, either in tort or implied contract, are moot issues.

DUNN, Justice (dissenting).

I dissent from the majority opinion. I would hold that there is credible evidence to support the jury verdict for respondent Mid-America Marketing Corporation.

Our review of the sufficiency of the evidence on appeal involves consideration of the evidence and inferences derived from the evidence in the light most favorable to upholding the verdict. *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104 (1973). We will consider appellants' evidence only insofar as it tends to amplify, clarify or explain evidence in support of the jury verdict. *Nugent v. Quam*, 82 S.D. 583, 152 N.W.2d 371 (1967). In fact, we must assume that all conflicts in the testimony were resolved in the respondent's favor by the jury. *Hannahs v. Noah*, 83 S.D. 296, 158 N.W.2d 678 (1968).

With these standards of review in mind, there is ample support in the record for the jury to conclude that:

(1) Mid-America and Dakota together produced a product between December 27, 1974, and May 27, 1975, which was legally protectible as a trade secret.

(2) Between May 27, 1975, and July 25, 1975, Dakota disclosed the trade secret to LaMaur in breach of its confidential relationship with Mid-America, and thus both Dakota and LaMaur appropriated the trade secret to their own use without the consent of Mid-America.

(3) Actual damages totaling $250,000 were sustained by Mid-America as a result of defendants' appropriation of the trade secret.

(4) There were acts of oppression, fraud or malice by the defendants sufficient to justify an award of punitive damages to Mid-America.

I would affirm the judgment of the trial court based upon the jury verdict awarding $270,000 for the unauthorized disclosure and use of a trade secret belonging to Mid-America.

HENDERSON, Justice (dissenting).

This case, involving a commercial tort of an alleged unauthorized disclosure and use of a trade secret, is one of first impression for this court. I dissent from the majority opinion on the grounds that: (1) Plaintiff's idea to improve the design and function of an electrically heated bonnet used in the industry to facilitate chemical processing of human hair was of sufficient novelty and secrecy to conform to the definition of a trade secret; (2) implicit in the confidential relationship that existed between plaintiff and defendant-appellant, Dakota Industries, Inc., was a duty not to disclose that trade secret to plaintiff's detriment; and (3) Dakota, in breach of its confidential relationship with plaintiff, disclosed the trade secret to LaMaur, which they both conspired to and did appropriate for their own use.

A well-stated summary of trade secret protection, recognized in a number of jurisdictions, is contained in a 1954 opinion of the Supreme Court of New Jersey:

A trade secret may consist of a formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. . . . Its subject matter must not be a matter of public knowledge or general knowledge within the industry. . . . Although a substantial measure of secrecy must exist, the secrecy need not be absolute and disclosure to employees involved in its use will not ordinarily result in loss of employer's protection. . . . Novelty and invention are not essential for the trade secret as

they are for patentability. . . . *And the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors.* Sun Dial Corporation v. Rideout, 16 N.J. 252, 257, 108 A.2d 442, 445 (1954), aff'd 29 N.J.Super. 361, 102 A.2d 90 (1954). (emphasis added)

Trade secrets need not rise to the level of novelty and invention in the patent law sense. *Koehring Company v. E. D. Etnyre & Company*, 254 F.Supp. 334 (N.D.Ill., 1966). A trade secret may consist of a "device or process which is clearly anticipated in the prior art or one that is merely a mechanical improvement." *Futurecraft Corp. v. Clary Corp.*, 205 Cal.App.2d 279, 23 Cal.Rptr. 198 (1962). The information in formulating it need not be entirely unknown, or, as one court stated it, the field need not be virginal. *Fairchild Engine & Airplane Corp. v. Cox*, Sup., 50 N.Y.S.2d 643, 657 (1944). It matters not that every ingredient of the formula, process, device, or compilation is known to the industry. A trade secret may consist of a method of combining any such ingredients as to produce a product superior to that of competitors. *Bolt Asso., Inc. v. Alpine Geophysical Asso., Inc.*, 244 F.Supp. 458, 463 (D.N.J. 1965).

This case does not depict a situation where the device or process is so widely known that it could be considered to be in the public's general store of information. This is evidenced by the simple fact that the products then on the market were not designed nor capable of performing, providing the benefits, or solving the problems that this bonnet could. Plaintiff conceived the idea for an electrically heated bonnet which would, within a totally enclosed environment, apply an even distribution of heat and moisture at that temperature best suited to break down the hair and process the applied chemicals during all of the various types of beauty treatments. LaMaur, a company engaged solely in the manufacturing and nationwide sale of products for use in the beauty industry, acknowledged this in its own advertising. So enthusiastic was LaMaur about the novelty and benefits of the bonnet, that it was advertised in a national beauty magazine as a "scientific" and "dynamic breakthrough." Although LaMaur later denied that there was anything novel or inventive about the bonnet, dismissing its own advertising as "poetic license," the court in *Schonwald v. F. Burkart Mfg. Co.*, 356 Mo. 435, 202 S.W.2d 7, 13 (1947), addressed such similar contentions on advertising to the contrary:

Although the abstract idea was not new, we think that the evidence warrants a finding that plaintiff had conceived and developed a specific concrete method of his own for the use and application of this abstract idea to accomplish a definite result, namely: to use available ingredients to make a certain type of canvas shoe sole. Defendant showed that it believed this method and product was something new, useful and novel by widely advertising it as a "sensational new sole," and "an original creation," and ["] definitely an improvement." *It is hardly in a position now to claim that the evidence conclusively shows that it was exactly the same plan and product known to and made by many others.* (Emphasis supplied.)

LaMaur was aware of the competitive advantage that this product would have over others in the industry. There can be no doubt that this bonnet was of sufficient novelty and invention to conform to the definition of a trade secret.

The next area to be examined is whether there was sufficient evidence to indicate that plaintiff communicated such information for the design and production of this bonnet to the defendant, Dakota, under an express or implied agreement limiting its use or disclosure. Confidential disclosures include disclosures to a person who is capable of manufacturing the device invented. *Becher v. Contoure Laboratories*, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929). Plaintiff met with Dakota's representative to determine if Dakota had the capacity to manufacture the product that he had con-

ceived. With these representatives, he disclosed his sketches, specifications, and drawings. These included: the size of the bonnet; the required electrical wiring which would provide even heat distribution throughout the bonnet, including specific wiring along the hairline, a definite problem area in processing chemicals; the temperature to be maintained inside of the bonnet; a thermostat capable of preventing the fluctuation of temperatures; the shape of the bonnet necessary to provide the enclosed environment and seal off the outer air; and the heavy insulation necessary to allow heat maintenance and prevent dissipation. At the time Bachmeier * disclosed this to Dakota, he informed the representative that "he did not want this matter spread around town."

It is not necessary for plaintiff to show that Dakota expressly agreed not to use information disclosed to it by plaintiff; the dealings between the parties may imply an agreement as to confidentiality. *Brown v. Fowler,* 316 S.W.2d 111 (Tex.Civ.App.1958). In this case, the relationship between plaintiff and Dakota was such that an obligation not to disclose the information known to the two of them about the bonnet can readily be inferred.

For example, after the disclosures about the bonnet were made to Dakota by Bachmeier, plaintiff and Dakota on February 21, 1975, executed an agreement under which Dakota agreed that it would manufacture and sell the ThermoChem Processing System (the bonnet) *only* to plaintiff and plaintiff agreed that it would buy that system *only* from Dakota. That agreement created a mutuality of interest and obligation between those two parties. Dakota admitted that by this agreement they took plaintiff into their confidence and that it created "mutual trust" between the parties at that point. Over two months later, pursuant to a second contract entered into between the parties on May 2, 1975, that situation of mutual trust, by Dakota's own

admission, had not changed. By the terms of that subsequent agreement, Dakota agreed to market the system "only through plaintiff" and plaintiff was to act as "sole" marketing agent for the system.

Additionally, the confidentiality of their relationship may be implied from what transpired preparatory to Dakota's trip to Minneapolis to visit LaMaur on May 27, 1975. At a meeting between plaintiff and Dakota on May 23, in recognition of and in an effort to see that their mutual interests were protected, plaintiff imposed a number of restrictions, conditions, or limitations upon Dakota in its May 27 negotiations with LaMaur, which Dakota accepted and to which both parties agreed. Those items included that no agreement was to be reached; LaMaur was not to be granted exclusive distribution rights; plaintiff's marketing representatives were to be provided for; plaintiff was to be compensated for its orders turned over to LaMaur; and there was to be *no* discussion of the technical details of the bonnet.

The cases have made clear the principle that such dealings between parties may by implication give rise to a confidential relationship. This principle is a legal conclusion recognizing the need for ethical practices in the commercial world. *Telechron, Inc. v. Parissi,* 197 F.2d 757 (2nd Cir. 1952); *Schreyer v. Casco Products Corp.,* 190 F.2d 921 (2nd Cir. 1951); *Seismograph Service Corp. v. Offshore Raydist,* 135 F.Supp. 342 (E.D.La.1955); *Kamin v. Kuhnau,* 232 Or. 139, 374 P.2d 912 (1962).

The next point to be addressed is whether Dakota used or disclosed this trade secret in violation of the confidence and to the injury of plaintiff. The defendants argue that the displaying of the bonnet at a number of industrial shows constitutes a publication, which bars any action thereafter from misappropriation of the claimed trade secret. Publication of a trade secret, however, does not affect the liability of one who misappropriates the information during the course of

---

* President of Mid-America Marketing Corporation, who assigned his rights to said corporation.

a confidential relationship. *Franke v. Wiltschek*, 209 F.2d 493 (2nd Cir. 1953). Further, it matters not whether LaMaur could have gained its knowledge from the study of the bonnet on display. The fact is that it did not. Rather, LaMaur gained it from Dakota via Dakota's confidential relationship with plaintiff. As a result of Dakota's confidential relationship, Dakota incurred a duty not to use the trade secret information to plaintiff's detriment. Dakota not only turned over the technical specifications of the bonnet to LaMaur, but, in addition, continued to manufacture them for sale by LaMaur. Plaintiff has never received any compensation for its interests in the bonnet. This is the duty Dakota breached.

According to the great weight of authority, the plaintiff in an action for breach of confidence involving a trade secret has the burden of proving three elements: (1) Possession of knowledge or information which is novel and not generally known, i. e., a trade secret; (2) Communication of this knowledge or information to the defendant under an *express or implied agreement* limiting its use or disclosure by the defendant; and (3) Use or disclosure of the knowledge or information so obtained in violation of the confidence and to the injury of the plaintiff. *Wilkin v. Sunbeam Corporation*, 377 F.2d 344, 346 (10th Cir. 1967); *Venn v. Goedert*, 319 F.2d 812 (8th Cir. 1963); *E. W. Bliss Company v. Struthers-Dunn, Inc.*, 408 F.2d 1108 (8th Cir. 1969); *Mann v. Tatge Chemical Co.*, 201 Kan. 326, 440 P.2d 640, 645 (1968); *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220 (Iowa 1977).

The essence of disclosing a trade secret is a breach of faith. *Franke v. Wiltschek*, supra. It is necessary to emphasize at this point that plaintiff elected to sue in tort under this theory, not in contract. As such, the contracts entered into between plaintiff and Dakota are of consequence only in so far as they tend to prove a necessary element of such tort: that there was an express or implied agreement between the parties, which limited Dakota's disclosure or use of this information concerning the bonnet. Once plaintiff has properly alleged and proved an actionable tort for breach of

confidence in disclosing a trade secret, the court is not empowered to resolve the issue under principles of contract.

The majority opinion states, however, that the eventual sale of the bonnet to third parties was included within the terms of an appendix to the May 2, 1975 contract between plaintiff and Dakota, theorizing that recovery under implied contract will not lie. It must be pointed out, however, that this provision referred to in the majority opinion only came into play upon termination of said contract between the parties. At the time Dakota misappropriated plaintiff's trade secret, the contract had not been terminated as defined by its terms. The majority opinion states that termination was triggered when plaintiff did not fulfill the requisite number of orders in the calendar quarter, i. e., 12,500. The calendar quarter, however, had not elapsed between the May 2 agreement and Dakota's betrayal on June 20, 1975, when Dakota disclosed the bonnet specifications to LaMaur. Nor would it have elapsed by July 25, 1975, the time at which Dakota and LaMaur finally entered into a written agreement providing for the manufacture and sale of the bonnet, making no provision for compensation to plaintiff nor acknowledgment of its interest in it.

Consequently, at the time this cause of action arose, it cannot be said that this type of sale to third parties was expressly included within the terms of the May 2, 1975 contract. To interpret it as such negates an element necessary in proving the offense. Plaintiff's allegation of an implied contract must be considered within the context under which the action was brought: that at the time Dakota breached its confidential relationship involving the trade secret, *there was an understanding, either express or implied, limiting Dakota from using such information to plaintiff's detriment.* The record reveals that Dakota knew or should have known that the information concerning the bonnet was not to be freely disclosed to other sources. Dakota, by providing such information to LaMaur, breached its confidential relationship with plaintiff.

Plaintiff also contends that LaMaur and Dakota conspired to misappropriate the trade secret. The record indicates that LaMaur was aware of plaintiff's interest in the bonnet. On several occasions LaMaur had negotiated with plaintiff to get exclusive distribution rights to the bonnet. In fact, LaMaur's acknowledgment of plaintiff's interest is seen from its inclusion in its proposed June 13 contract between itself and Dakota, a provision calling for the written consent of plaintiff to the agreement. Plaintiff did not consent to the proposed contract which contained many of the same provisions which plaintiff had on earlier occasion rejected. The contract made no provision whatsoever for compensation to plaintiff for its interest in the bonnet acquired by reason of its efforts and the bonnet's conception and development. Notwithstanding plaintiff's refusal to sign said contract, Dakota forwarded the manufacturing specifications to LaMaur. By late June, without the consent of plaintiff, LaMaur had tested the bonnet; written and printed an instruction pamphlet on the customer's use of *its* bonnet; and arranged for the placement of an advertisement in a national beauty magazine announcing *its* new bonnet. Pursuant to a contract entered into between Dakota and LaMaur on July 25, 1975, by late August, LaMaur had already sold 13,623 bonnets. No compensation has ever been paid to plaintiff.

LaMaur did not receive the manufacturing specifications from an untainted source. It knew of plaintiff's interests in the bonnet. Third parties, who use a trade secret with knowledge of a breach of confidence, are equally liable with that person who disclosed such information. *A. H. Emery Co. v. Marcan Products Corporation,* 268 F.Supp. 289 (S.D.N.Y.1967). See also, *Stone v. Goss,* 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344 (Ct.Err. & App. 1903); *Lamont, Corliss & Co. v. Bonnie Blend Chocolate Corp.,* 135 Misc. 537, 238 N.Y.S. 78 (Sup.Ct.1929); *Friedman v. Stewarts Credit Corp.,* 26 N.Y. S.2d 529 (Sup.Ct.1939), *aff'd,* 261 App.Div. 990, 26 N.Y.S.2d 533 (2d Dept. 1941); *Minnesota Mining & Mfg. Co. v. Technical Tape Corp.,* 23 Misc.2d 671, 192 N.Y.S.2d 102 (Sup.Ct.1959), *aff'd,* 15 A.D.2d 960, 226 N.Y. S.2d 1021 (2d Dept. 1962).

The jury resolved the complex issues in favor of the plaintiff. The trial court's instructions, although not framed in the exact phraseology above, were sufficient for the jury to adequately determine: that the plaintiff had a confidential relationship with Dakota; that through their mutual endeavors, plaintiff and Dakota developed a trade secret within the framework of that confidential relationship; and that Dakota breached its confidential relationship with the plaintiff by disclosing the trade secret to LaMaur. In addition, the trial court's instructions were proper with respect to whether LaMaur, together with Dakota, conspired to indeed appropriate that trade secret to their own use.

In reviewing the record and the authorities regarding trade secret protection, I feel that plaintiff has met the burden of proving the three elements required in a breach of confidence involving a trade secret. It is for this reason I would affirm the judgment of the trial court based upon the jury verdict awarding $270,000 for the unauthorized disclosure and use of a trade secret belonging to plaintiff.