SUN DIAL CORPORATION, A CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CARL D. RIDE-OUT, JAMES L. RIDEOUT, ROBERT A. WHITFIELD, NANCY ORI WHITFIELD AND PRECISION MARKING CO., A CORPORATION OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued September 20, 1954—Decided October 18, 1954.

See also, 31 *N. J. Super.* 375, 106 *A.* 2d 747.

*Mr. Walter D. Van Riper* argued the cause for the appellants (*Messrs. Van Riper & Belmont*, attorneys).

*Mr. Ira Milton Jones* of the Wisconsin Bar argued the cause for the respondent (*Messrs. Davidson & Miniutti*, attorneys).

The opinion of the court was delivered by

JACOBS, J.  The Chancery Division dismissed the plaintiff's action to enjoin the individual defendants, its former employees (along with their corporation, the defendant Precision Marking Co.), from using or disclosing the process which they learned while in its employ.  See 25 *N. J. Super.* 591 (*Ch. Div.* 1953).  The Appellate Division found that the evidence adequately established the plaintiff's claim that it had a valuable secret process which the individual defendants learned in confidence and which they should equitably not be permitted to use or disclose.  See 29 *N. J. Super.* 361 (*App. Div.* 1954).  It reversed the judgment entered in the Chancery Division and we granted certification under *R. R.* 1:10–2.  15 *N. J.* 379.

William J. Williams, Jr., organized the plaintiff Sun Dial Corporation in 1943 for the purpose of manufacturing precision dials and panels.  Immediately prior thereto he had been sales manager of Linotone Corporation, a dial and panel

making subsidiary of Mergenthaler Linotype Company. Although the Chancery Division referred to testimony that there was nothing novel in the Sun Dial process and that both Linotone and Sun Dial used photography in the making of dials, it recognized that "the Sun Dial process differs from the Linotone process in the method of coating and relieving the dials and the solutions and agents used." The Appellate Division found flatly that Sun Dial's process differed materially from Linotone's. It stated that Linotone's method was characterized by etching the metal surface as contrasted with Sun Dial's surface relieving and pointed to specific differences while stressing certain elements in the Sun Dial process and the substantial research and expenditures involved in their development. We are satisfied with the Appellate Division's finding that the Sun Dial process differed materially from Linotone's. We are likewise satisfied that the individual defendants learned the plaintiff's process while they were in its employ and used it after they had left the plaintiff's employ and had organized the defendant corporation for the competitive purpose of making precision dials and panels. In this regard the findings by the Chancery Division and the Appellate Division are in full accord.

Williams testified that from the inception of the plaintiff's business there was a "No Admittance" sign at the entrance of its plant and that its employees were told its process was secret. Others who visited the plant testified that they were told the process was secret and the Chancery Division found that the "proofs disclose that Williams endeavored to have the Sun Dial process appear 'secret.'" Although Williams described his process in general terms in a 1947 article appearing in *Plastics Magazine*, the article contained what the Chancery Division described as "deliberate ambiguity" and a competitor testified that with the information supplied in the article he had tried but was unable to duplicate the Sun Dial process. In 1949 a sign was posted at the plaintiff's new plant which requested that admittance not be asked "as we are working under a secret process." Visitors were required to sign a register under a statement that

"Any processing observed on these premises is considered Secret Process which I agree not to use or divulge." The defendants contend that these precautions were taken only because Sun Dial then had a government contract relating to the Norden gunsight but Williams testified, from supporting corporate records, that they were taken long before the Norden contract or any accompanying security regulations. The defendants further contend that they were not told during their employment that the process was secret; we are in agreement with the Appellate Division's analysis of the testimony and its finding to the contrary.

▇ A trade secret may consist of a formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. See *National Tile Board Corp. v. Panelboard Mfg. Co.*, 27 *N. J. Super.* 348, 351 (*Ch. Div.* 1953); 4 *Restatement, Torts*, § 757, *p.* 5 (1939). Its subject matter must not be a matter of public knowledge or of general knowledge within the industry. *Restatement, supra,* at 5. Although a substantial measure of secrecy must exist, the secrecy need not be absolute and disclosure to employees involved in its use will not ordinarily result in loss of the employer's protection. *Restatement, supra,* at 6. Compare the suggestion in *Vulcan Detinning Co. v. American Can Co.*, 72 *N. J. Eq.* 387, 396 (*E. & A.* 1907), that it is "that qualified secrecy that arises from mutual understanding and that is required alike by good faith and good morals." See Barton, *A Study in the Law of Trade Secrets*, 13 *U. of Cin. L. Rev.* 507, 519 (1939). Novelty and invention are not essential for the trade secret as they are for patentability. See *Restatement, supra,* at 7; *Ellis, Trade Secrets*, 28, 35 (1953); *Callman, Unfair Competition and Trade Marks* (*2d ed.* 1950), 799. *Cf. Boost Co. v. Faunce*, 17 *N. J. Super.* 458, 463 (*App. Div.* 1952). And the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors. See *Stone v. Grasselli Chemical Co.*, 65

*N. J. Eq.* 756, 760 (*E. & A.* 1903), where Justice Swayze said:

"The ingredients used in the manufacture of Stone's depilatories were well known, and had been used for that purpose for years before the XXX and XXXX were put upon the market, and the same ingredients were used by the Grasselli Chemical Company in the manufacture of a depilatory. It is urged that the only advantage possessed by the complainants arose out of skill in handling, and not out of a secret process, and that there was no secret either in the ingredients or in the method of compounding them. The complainants combined the ingredients by a different method from any other in use, and the result was a product of a different character. The complainants' process of manufacture was considerably more complicated than [that of the Grasselli Chemical Company]. The secret consisted in a knowledge of the proper method of mixing the ingredients, and treating them, in order to produce a product of proper consistency."

In the light of the foregoing principles we find little basis for questioning the Appellate Division's determination that although its individual components may in themselves have been well known, the plaintiff's process in its aggregate was, in fact, a trade secret. Apart from the defendants, the plaintiff and its licensees are apparently the only dial makers who are familiar with it and use it in their plants. As the Appellate Division pointed out, competitors have tried but have been unable, without the process of the plaintiff, to achieve its high degree of accuracy and fine technical finish on dials and panels. Mr. John E. Paul, senior vice-president of the United States Radium Corporation, testified that he had read the article in *Plastics Magazine*, had visited the plaintiff's plant and seen one of its dials and that although his company attempted to duplicate the dial it was unable to do so. He testified further that when he was taken through the plaintiff's plant he was told that the process was secret and that the thing that impressed him "was you didn't see much until you came to what they called the relieving process. The dials are in a booth, you see one cover pertaining to the whole thing, and a man stands there with a spray gun with another solution and is working on this very carefully and manipulating it, practically part of the control, and all of

a sudden the excess material runs off and the image comes up in a beautiful form." He said that it was new to him "and quite amazing" although he had been associated with the dial making industry for decades. The United States Radium Corporation at one time thought of purchasing the plaintiff corporation in order to obtain its secret process but ultimately obtained a license from the plaintiff under which it is now using it. Mr. Richard A. Anderson, president of the Maryland Etching Company, testified that he has been associated with the dial-making industry since 1946; that he tried but could not duplicate the Sun Dial process; and that his company ultimately obtained a license from the plaintiff under which it is now using its process. Although the individual defendants know the plaintiff's process, they admittedly learned it while in the plaintiff's employ; there is no reason to suspect that they could have duplicated it through use of their skill and knowledge of the dial-making trade generally as distinguished from the special information relating to the plaintiff's process imparted to them during their employment. See *Callman, supra*, at 825.

██ It is true that the plaintiff never entered into any express agreement with the individual defendants restraining their use of its process after they left its employ. See *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 2 *N. J.* 235, 248 (1949). But such express agreement need not be established to entitle the plaintiff to relief; it is sufficient if it be shown, as here, that the employees learned their employer's trade secret in confidence and in violation of their confidence used or disclosed it after termination of their employment. It is the employees' wrongful conduct in violating the confidence, by using the uniquely valuable information for purposes other than their employer's benefit, which furnishes a clear and persuasive basis for equitable intervention. See *E. I. Du Pont de Nemours Powder Co. v. Masland*, 244 *U. S.* 100, 102, 37 *S. Ct.* 575, 61 *L. Ed.* 1016, 1019 (1917); *Carver v. Harr*, 132 *N. J. Eq.* 207, 209 (*Ch.* 1942); *Salomon v. Hertz*, 40 *N. J. Eq.* 400, 402 (*Ch.* 1885). *Cf. Morison v. Moat*, 9 *Hare* 241, 255, 68 *Eng. Rep.* 492, 498

(1851), where the vice-chancellor in discussing equity's well established jurisdiction to restrain improper disclosures of trade secrets said:

"Different grounds have indeed been assigned for the exercise of that jurisdiction. In some cases it has been referred to property, in others to contract, and in others, again, it has been treated as founded upon trust or confidence, meaning, as I conceive, that the Court fastens the obligation on the conscience of the party, and enforces it against him in the same manner as it enforces against a party to whom a benefit is given the obligation of performing a promise on the faith of which the benefit has been conferred; but, upon whatever grounds the jurisdiction is founded, the authorities leave no doubt as to the exercise of it."

See Morris, *Agency and Partnership,* 9 *Rutgers L. Rev.* 198, 202 (1954); *Ellis, supra,* at 13; *Callman, supra,* at 786.

The Appellate Division made the finding, in which we concur, that the plaintiff took reasonable precautionary measures to maintain the secrecy of its process and that the necessary secrecy existed. In discussing the matter, however, it suggested that perhaps a greater measure of proof was required to establish the secrecy of the process than was required to establish the precautions taken to maintain its secrecy. The evidence as to precautions was material in establishing that the process was not available to competitors or the public generally and was learned by the employees in confidence. It was an element of the plaintiff's whole claim for injunctive relief and that relief was available to it only upon the clear showing which it made. *Cf. State v. Jennings,* 131 *N. J. Eq.* 511, 512 (*E. & A.* 1942); *Harrison v. Floyd,* 26 *N. J. Super.* 333, 347 (*Ch.* 1953). There is undoubtedly, as Vice-Chancellor Bigelow pointed out in *Haut v. Rossbach,* 128 *N. J. Eq.* 77, 79 (*Ch.* 1940), affirmed 128 *N. J. Eq.* 478 (*E. & A.* 1941), an important policy which "encourages employes to seek better jobs from other employers or to go into business for themselves." See *Abalene Exterminating Co. of N. J., Inc. v. Elges,* 137 *N. J. Eq.* 1, 3 (*Ch.* 1945). But there is also a policy which is designed to protect employers against improper disclosures of information which

their employees have received in confidence and this policy may perhaps be receiving increased recognition in the light of the marked changes in the attitude of the law towards the need for commercial morality. See *Ellis, supra,* at 14. Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and use elsewhere their acquired skill and knowledge of the trade generally as distinguished, however, from any trade secrets imparted to them in confidence and which they must continue to honor as such. The situation in the instant matter was rightly found by the Appellate Division to fall within the latter grouping.

Throughout their brief and argument the defendants have attacked the Appellate Division's findings as differing from those made in the Chancery Division. However, it is beyond dispute that the Appellate Division had full power to make its own findings, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *R. R.* 1:5–3; *R. R.* 2:5; *Coles v. Osback,* 22 *N. J. Super.* 358, 367 (*App. Div.* 1952), certification denied, 11 *N. J.* 330 (1953); *Series Publishers, Inc. v. Greene,* 9 *N. J. Super.* 166, 171 (*App. Div.* 1950). Both the Chancery Division and the Appellate Division found that the Sun Dial process differed from the Linotone process, although the differences stressed by the Appellate Division were greater. Both the Chancery Division and the Appellate Division found that Williams endeavored to have the Sun Dial process appear secret and that his article in *Plastics Magazine* contained deliberate ambiguity and did not constitute any effective public disclosure. And although the Chancery Division seemingly differed with the Appellate Division's finding as to the sufficiency of the precautionary measures taken to maintain the secrecy of the process, the substantially uncontroverted facts were that at least some precautionary measures were taken from 1943 to 1949, more extensive precautionary measures were taken thereafter, and competitors, though they had tried, were unable to duplicate the process. The individual defendants did deny that they knew

or were told during their employment that the process was secret; there was, however, direct evidence to the contrary and there were significant circumstances and bits of their own testimony which amply justified the Appellate Division in rejecting their denials. See 29 *N. J. Super.*, at 372. *Cf. In re Perrone's Estate*, 5 *N. J.* 514, 521 (1950). In any event, our independent examination of the record has led us to the same result; we are convinced that during their employment with the plaintiff the individual defendants were made aware of the process with full understanding that it was and was to remain secret in nature and in all good conscience they should not now be permitted to use or disclose it to the hurt of the plaintiff. Accordingly, the judgment entered in the Appellate Division is:

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For reversal*—Justices HEHER and WACHENFELD—2.