756 A.2d 1047 (2000)
334 N.J. Super. 62
RYCOLINE PRODUCTS, INC., Plaintiff-Appellant, Sun Graphic, Inc., Plaintiff,
v.
Michael WALSH, Steven Pauloski, Bernard Bush, and Eric Berliner, individually and as employees, shareholders, officers, and/or directors of C & W Unlimited, Defendants-Respondents, C & W Unlimited, a corporation, and Carl Kaiser, individually and as an employee of C & W Unlimited, Defendants/Third-Party Plaintiffs-Respondents,
v.
Norman J. Nichol, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued April 11, 2000.
Decided August 15, 2000.
*1049 Richard F. Collier, Jr., Somerset, argued the cause for plaintiff-appellant (Collier, Jacob & Mills, attorneys; Robert J. Basil, on the brief).
Mark H. Sobel, Woodbridge, argued the cause for defendants-respondents (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Mr. Sobel and Sabrina A. Kogel, Iselin, of counsel; Christine F. Marks, Woodbridge, on the brief).
Before Judges KIMMELMAN, CIANCIA and ARNOLD.
*1048 The opinion of the court was delivered by ARNOLD, J.A.D.
Plaintiff Rycoline Products, Inc. (Rycoline) manufactures chemical products for use in the printing industry. It appeals from certain pretrial rulings and from an order entered after the presentation of plaintiff's case dismissing its claims pursuant to R. 4:37-2(b).[1] Defendant C & W Unlimited (C & W) is a competitor of Rycoline and is owned and operated by defendants Michael Walsh and Eric Berliner.
Defendant Karl Kaiser began his employment with Rycoline in 1976 and by 1995 held the position of East Coast District Manager. Testimony introduced at trial indicated that he was responsible for the local manufacturing facility as well as for manufacturing chemical products according to the proper formula and within Rycoline's quality control guidelines. In October 1985, Kaiser executed a "confidentiality *1050 agreement" with Rycoline. It provided that he would not disclose certain information that was deemed "confidential" by Rycoline. Pursuant to this agreement, Kaiser agreed not to reveal to others "during and after my employment ... so long as any such information may remain confidential, secret or otherwise wholly or partially protectable" plaintiff's "formulas, processes, methods, manufacturing techniques, discoveries, mixes, compounds" or other such matter including "production or sales activities." Kaiser had not, however, entered into either a restrictive covenant not to compete or a formal written employment agreement with Rycoline.
In 1995, defendants Steven Pauloski and Bernard Bush were members of the sales staff of Rycoline's East Coast District. Other members of the sales staff included Morton Altholz and Frank Kreppel.
In April and May 1995, Kaiser, Pauloski, and Bush left their employment with Rycoline and began working for C & W. Shortly thereafter, C & W began to manufacture a product called Safe 200+ that is similar to one manufactured by plaintiff known as ACFS 276. Both ACFS 276 and Safe 200+ are so-called fountain solutions which are admittedly inferior to a product called Anchor MXEH manufactured by a third company, Anchor Lithkemko, (Anchor) which is not a party to this litigation. There is no patent on Anchor MXEH. It is protected only as a trade secret.
Evidence introduced at trial established that Rycoline tried to discover the formula for Anchor MXEH through "reverse engineering," i.e., by analysis of MXEH. They hired chemists, set up a laboratory and spent somewhere between nine hundred thousand and one million dollars in 1993 and 1994 in an effort to discover the formula for Anchor MXEH. Despite this effort, Rycoline could not discover the formula for MXEH. But, as a result of this reverse engineering effort, they did develop ACFS 276. While a better product than what Rycoline had been selling, it still was concededly not as good as Anchor MXEH. For example, ACFS 276 only worked about 70% of the time. Nevertheless, it was a successful product. Evidence was introduced that ACFS 276 was manufactured in Rycoline's plant in Clifton at a time when Kaiser was the East Coast district manager. Evidence was also introduced that Kaiser may have had access to a hard copy of the formula for ACFS 276.
However, no evidence was introduced of any effort by C & W and Walsh to reverse engineer Anchor MXEH. They did produce a product called SAFE in 1991, SAFE 100 shortly thereafter and SAFE 200 in April 1993. Significantly, in April 1995, there was a big change in SAFE 200 when Kaiser resigned from Rycoline and was hired by C & W. Within just eight days after Kaiser began his employment at C & W, C & W began purchasing chemicals found in Rycoline's product ACFS 276. Several months later, C & W formulated SAFE 200T which included a three-part buffering system as well as a two-part synthetic gum/natural gum system, like the systems found in Rycoline's ACFS 276. By July 1995, Walsh had formulated SAFE 300, which included a so-called three-part acid buffering system found in ACFS 276.
This case has an extensive procedural history. By the time of trial, the only issues remaining to be resolved concerned Rycoline's claim for employee piracy against C & W, Walsh, Berliner, and Kaiser; Rycoline's claim against those same defendants for the misappropriation of plaintiff's trade secret concerning ACFS 276; Rycoline's claim against Kaiser for alleged breach of his confidentiality agreement with Rycoline and his duty of loyalty to Rycoline; and conspiracy claims relating to those three claims. Following the presentation of plaintiff's case, the trial judge dismissed those claims pursuant to R. 4:37-2(b). Plaintiff appeals.
In addition, Rycoline appeals the following rulings by the trial judge: (1) barring *1051 the admission into evidence of certain testimony and excluding evidence of other alleged prior wrongful conduct of C & W and Walsh; (2) the denial of Rycoline's motion to amend its complaint to add claims for negligent hiring and supervision and for breach of the Racketeer Influenced and Corrupt Organizations Act (RICO Act) 18 U.S.C.A. §§ 1961 to 1968, as well as its New Jersey counterpart ("New Jersey RICO Act") N.J.S.A. 2C:41-1 to -6.2; (3) refusing to allow Rycoline to file a brief in opposition to defendants' motion to dismiss its claim for industrial sabotage/product tampering; (4) dismissing Rycoline's claim under 15 U.S.C.A. § 1125(a) the Lanham Act, 15 U.S.C.A. §§ 1051-1127(Lanham Act), and refusing to permit Rycoline to amend its Lanham Act claim. Furthermore, Rycoline contends that the trial judge erred, when in the course of granting the involuntary dismissal of its claims, he commented that plaintiff's salesmen were dissatisfied with plaintiff's compensation plan for them. Finally, plaintiff requests that, if the case is remanded for a new trial, it be assigned to a different judge.
Specifically, Rycoline raises the following points on appeal:
A. RYCOLINE PRESENTED SUFFICIENT EVIDENCE AT TRIAL TO EASILY SURVIVE DISMISSAL UNDER R. 4:37-2(b)
i. Standards For Dismissal Under R. 4:37-2(b)
ii. Rycoline Presented Sufficient Evidence At Trial To Permit The Jury To Find That Defendants Had Induced Kaiser To Breach His Duties of Loyalty To Rycoline, Had Illegally Raided Rycoline's Sales Force, And Had Tortiously Interfered With Rycoline's Employee Relations
iii. Rycoline Presented Sufficient Evidence To Establish That Rycoline's Formula For ACFS 276 Was Protected By New Jersey Law Against Misappropriation By Kaiser and C & W
iv. Rycoline Presented Sufficient Evidence To Prove That ACFS 276 Was Misappropriated By Kaiser And Given To C & W
v. Rycoline Presented Sufficient Evidence To Prove That Berliner Had Conspired With The Other Defendants, Participated In The Wrongful Conduct, Or, At A Minimum, Ratified The Misconduct Resulting In The Loss of Rycoline's Key Manager, Sales Staff and Formula
B. KAISER, BUSH AND PAULOSKI BREACHED THEIR DUTIES OF LOYALTY JUST BEFORE LEAVING IN APRIL/MAY 1995, BY ACTING ON BEHALF OF C & W BEFORE THEIR RESIGNATIONS
C. JUDGE PLECHNER ERRED IN BARRING THE TESTIMONY OF DR. EDWIN HARTMAN, AN EXPERT IN BUSINESS ETHICS
D. JUDGE PLECHNER ERRED IN HOLDING THAT RYCOLINE FAILED TO STATE A CLAIM FOR NEGLIGENT HIRING AND SUPERVISION
E. JUDGE PLECHNER ERRED IN REFUSING TO GRANT RYCOLINE'S REQUEST TO FILE BRIEFS IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT TO DISMISS A CLAIM OF INDUSTRIAL SABOTAGE AT THE BERGEN RECORD
F. RYCOLINE STATED A CLAIM BASED UPON THE LANHAM ACT, § 43, 15 U.S.C. § 1125(a)(1)(B)
G. JUDGE PLECHNER ERRED WHEN HE DENIED RYCOLINE'S TIMELY MOTIONS TO AMEND, AND TO ASSERT RICO CLAIMS *1052 H. EVEN IF THE AMENDMENTS TO ALLEGE WRONGDOING FROM 1980-1993 WERE PROPERLY EXCLUDED, IT WAS ERROR TO BAR ALL EVIDENCE OF THAT WRONGDOING AT TRIAL, AS THE EVIDENCE DIRECTLY CONTROVERTED DEFENDANTS' CLAIM THAT THEY WERE CAPABLE OF CREATING SOPHISTICATED CHEMICAL PRODUCTS WITHOUT STEALING RYCOLINE'S FORMULA
I. JUDGE PLECHNER ERRED IN PRECLUDING RYCOLINE FROM READING THE TRANSCRIPT OF LARRY ERWIN TO THE JURY, AS ERWIN'S TESTIMONY DEMONSTRATED THAT KAISER WAS INTENDING TO LEAVE RYCOLINE IN 1995 AND TAKE HIS SALESMEN WITH HIM
J. THE MAIN "DEFENSE" TO RYCOLINE'S ILLEGAL RECRUITING CLAIMS, THAT THE RYCOLINE SALESMEN WHO WORKED UNDER KAISER WERE UNHAPPY WITH THEIR COMPENSATION, WAS IRRELEVANT TO THIS ACTION
K. ON REMAND, THIS CASE MUST BE ASSIGNED TO A NEW JUDGE, AS JUDGE PLECHNER HAS ALREADY MADE CREDIBILITY DETERMINATIONS PREJUDICIAL TO RYCOLINE
We reverse the involuntary dismissal of the four claims by the trial judge. In all other respects we affirm the trial court's orders and decisions.
Preliminarily, a trial court evaluating a motion for involuntary dismissal under R. 4:37-2(b), must accept as true all evidence which supports the position of the party opposing the motion and accord that party the benefit of all reasonable inferences. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). The motion must be denied "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). The trial court should not rely on credibility findings in deciding the motion for an involuntary dismissal except where the testimony is so persuasive that no reasonable person could disbelieve it. Caliguire v. City of Union, 104 N.J.Super. 210, 217, 249 A.2d 603 (App.Div.1967), aff'd sub nom, Caliguire v. City of Union City, 53 N.J. 182, 249 A.2d 577 (1969) (relying on Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482,126 A.2d 323 (1956)). Thus, the essential issue in evaluating a motion for dismissal under R. 4:37-2(b) is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 435, 667 A.2d 355 (App.Div.1995).
To prevail in New Jersey upon a claim for misappropriation of a trade secret, a trade secret owner must establish that:
(1) a trade secret exists;
(2) the information comprising the trade secret was communicated in confidence by plaintiff to the employee;
(3) the secret information was disclosed by that employee and in breach of that confidence;
(4) the secret information was acquired by a competitor with knowledge of the employee's breach of confidence;
(5) the secret information was used by the competitor to the detriment of plaintiff; and
(6) the plaintiff took precautions to maintain the secrecy of the trade secret.
Rohm and Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429-30 (3d Cir.1982); Stone *1053 v. Goss, 65 N.J. Eq. 756, 759-60, 55 A. 736 (E. & A.1903). There is no requirement that a trade secret owner establish that the competitor used the secret information to make a product which is identical to the product which is a trade secret. Pioneer Hi-Bred Int'l v. Holden Found. Seeds, 35 F.3d 1226 (8th Cir.1994). The trial court's determination that ACFS 276 and SAFE 200 + are not identical is not dispositive of the issue as to whether there was misappropriation of a trade secret.
To establish the first element of a misappropriation claim, plaintiff is required to show the existence of a trade secret. The trial judge found that plaintiff had not established a trade secret. In reaching that conclusion he erred in a number of ways. First, he misinterpreted the decision in Hammock by Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 383-84, 662 A.2d 546 (1995), and the cases relied on by the Court therein. In Hammock, supra, 142 N.J., at 383-84, 662 A.2d 546, the Court cited with approval the Restatement of Torts, § 757 (1939), and two Third Circuit Court of Appeals cases interpreting Pennsylvania's definition of a trade secret. Specifically, the opinion of the court in Hammock supra, 142 N.J. at 383-84, 662 A.2d 546 stated:
[T]he Third Circuit has been instructive in establishing standards for defining the not-so-obvious trade secrets. For example, in upholding a protective order for trade secrets regarding design, safety and quality test information, but denying a protective order to limit discovery of other accident or claims information for the Bic butane lighter, that court referred to Comment b of the Restatement of Torts § 757 (1939) which provides:
A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.
[Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir.1989) (quoting Restatement of Torts § 757 comment b (1939)).]
That court also stated that "information that is in the public domain or which has been `reverse engineered,' i.e., garnered by beginning with the finished product and determining the process used to manufacture itcannot be protected as trade secrets." Id. at 199-200. Relying on its prior decision in SI Handling Systems, Inc. v. Heisley, 753 F.2A2d 1244, 1256 (1985), the Third Circuit articulated some additional considerations that we find useful:
(1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
[Smith, supra, 869 F.2d at 200 (citing Restatement of Torts § 757, comment b (1939)).]
In granting defendant's motion for an involuntary dismissal, the trial judge concluded that ACFS 276 was not a trade secret because it resulted from Rycoline's efforts to reverse engineer Anchor MXEH. In ruling on the motion the trial judge stated:
But I don't think that Rycolineand I get thefrom reading these casesthe three cases that we've discussed, in particular Smith versus Bic, Hammock by Hammock versus Hoffman LaRoche and S.I. Handling Systems versus Heisly, *1054 the feeling that I get from these cases is you cannot protect as your trade secret that product which was taken from another manufacturer through reengineering of his trade secret.

[Emphasis added.]
We disagree with the trial court's conclusion that ACFS 276 could not be a trade secret because it resulted from Rycoline's effort to reverse engineer the formula for Anchor MXEH. None of the cases relied upon by the trial judge stand for that proposition.
In SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir.1985) the court interpreted Pennsylvania's law of trade secrets in the context of defendant's contention that plaintiffs CARTRAC product could be reverse engineered and, therefore, was not a trade secret.
In pertinent part the opinion of the court stated:
Matters which are fully disclosed by a marketed product and are susceptible to "reverse engineering"i.e, "starting with the known product and working backward to divine the process which aided in its manufacture," Kewanee Oil Co., v. Bicron Corp., 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974) cannot be protected as trade secrets. See Air Products and Chemicals v. Johnson, 296 Pa.Super. 405, 432, 442 A.2d 1114, 1128 (1982).

[Id. at 1255.]
Thus, under Pennsylvania law, a trade secret will not be found to exist and a plaintiff's misappropriation action will be dismissed if it can be proven that, at the time the misappropriation occurred, the defendant could have learned plaintiff's trade secret because the marketed product was susceptible to reverse engineering. SI Handling Sys., Inc. v. Heisley, supra, 753 F.2d at 1262; Henry Hope X-Ray Prods., Inc. v. Marron Carrel, Inc., 674 F.2d 1336, 1341 (9th Cir.1982). The Court in SI Handling did not hold that a trade secret cannot exist in a product (ACFS 276) just because it was developed by attempts to reverse engineer a product which is a trade secret (Anchor MXEH.)
In Smith v. BIC Corp., 869 F.2d 194 (3d Cir.1989), the court paraphrased the above stated portion of the opinion in SI Handling and stated that "[c]onsequently, information that is in the public domain or which has been reverse engineered,i.e., garnered by beginning with the finished product and determining the process used to manufacture itcannot be protected as trade secrets." Id. at 199-200. Smith was not a trade secret misappropriation case. It was a personal injury and wrongful death action to recover for injuries sustained when a cigarette lighter manufactured by the BIC Corporation exploded causing severe second and third-degree burns resulting in death. The issue before the court was whether BIC Corporation was entitled to a protective order as to discovery given to plaintiff because the design of the lighter was a trade secret.
Thus, neither SI Handling nor Smith stand for the proposition that ACFS 276 could not be a trade secret because it was developed through efforts to reverse engineer MXEH. See Commissioners' Comments at § 1 of the Uniform Trade Secrets Act which reads in relevant part as follows:
Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of the product lends itself to being readily copied as soon as it is available on the market. On the other hand, if reverse engineering is lengthy and expensive, a person who discovers a trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering.
[Unif. Trade Secrets Act § 1, 14 U.L.A. 433 (1985).]
Furthermore, even under the trial court's formulation of the principle of law from the Hammock, SI Handling and *1055 Smith cases, Rycoline's formula for ACFS 276 could still constitute a trade secret because there was no evidence that ACFS 276 could be reverse engineered or that ACFS 276 was itself the successful reverse engineering of the trade secret formula for Anchor MXEH. See Berkla v. Corel Corp., 66 F.Supp.2d 1129, 1145 (N.D.Cal.1999). A review of proofs adduced duringplaintiff's case in chief shows no evidence that the formula for ACFS 276 was reverse engineered or that SAFE 200+ could be reverse engineered from either ACFS 276 or Anchor MXEH. Thus, the trial judge's primary reason for determining that plaintiff's formula for ACFS 276 did not constitute a trade secret was in error.
Furthermore, we hold that once plaintiff introduces evidence of similarity in the products (ACFS 276 and SAFE 200+) the burden shifts to defendant to show that it could have arrived at its product by reverse engineering some product in the public domain. Henry Hope v. X-Ray Prods., Inc., supra, at 1341. But See SI Handling, supra, 753 F.2d at 1255 (where the court assumed that plaintiff has the burden of proving that its product is not readily ascertainable). In determining whether ACFS 276 could be reverse engineered, defendant must demonstrate that it is "quickly reverse engineerable." See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890 (Minn.1983). The more difficult, time consuming and costly it would be to develop the product, the less likely it can be considered to be "reverse engineerable." See Zotos International, Inc. v. Young, 830 F.2d 350 (D.C.Cir.1987); ILG Industries, Inc. v. Scott, 49 Ill.2d 88, 273 N.E.2d 393 (1971).
Another reason given by the trial judge for concluding that plaintiff's formula for ACFS 276 could not be a trade secret was his conclusion that the three secret technologies used in ACFS 276 were well known outside of Rycoline's business. We disagree. In Sun Dial Corp. v. Rideout, 16 N.J. 252, 257, 108 A.2d 442 (1954), the New Jersey Supreme Court discussed the ideas and information that can constitute a trade secret and commented that "the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors." The selection of particular ingredients for a formula from a vast array of publicly known possible ingredients may result in trade secret protection for the specific selection made. See National Starch and Chem. Corp. v. Parker Chem. Corp., 219 N.J.Super. 158, 160-62, 530 A.2d 31 (App.Div.1987). Thus, a secret selection and combination of ingredients may constitute a trade secret even though the separate parts of that combination are known to the industry.
Still another reason given by the trial judge for determining that ACFS 276 was not a trade secret concerned his conclusion that Rycoline's use of a twopart gum system in ACFS 276 was "not a great step in imagination" and represented a lack of "meritorious discovery" on Rycoline's part. In short, he concluded that Rycoline's gum system in ACFS 276 was not novel enough to merit protection as a trade secret. However, only a very minimal novelty requirement is imposed for a trade secret. See Kewanee Oil Co. v. Bicron Corp., supra, 416 U.S. at 476, 94 S.Ct. at 1884, 40 L.Ed.2d at 322-33. "Novelty and invention are not essential for the trade secret as they are for patentability." Sun Dial Corp. v. Rideout, supra, 16 N.J. at 257, 108 A.2d 442. Furthermore, our review of the record indicates that the trial judge misperceived the trade secret involved in ACFS 276. The use of the known two-part gum system technology was only a part of the secret. The complete secret was the combination of the three known technologies, including the gum-system technology along with the other ingredients in ACFS 276 to produce a marketable product. See Rohm and Haas Co. v. Adco Chem. Co., 689 F.2d 424 (3d *1056 Cir.1982). Under the criteria of Rohm and Haas Co. and Sun Dial Corp., the formula for ACFS 276 could constitute a trade secret. Thus, we conclude that the trial judge erred in finding that there was insufficient "meritorious discovery" in ACFS 276 to support finding a trade secret.
Another reason given by the trial judge for deciding that ACFS 276 could not be a trade secret concerned the circumstance that no proof had been presented showing that Walsh was unable to formulate a product like SAFE. However, plaintiff does not have the burden of proving such inability as an element of a misappropriation claim. See Rohm and Haas Co. v. Adco Chem. Co., supra, 689 F.2d at 429-30. Plaintiff need only prove that defendants learned the formula for ACFS 276 through improper means. That is, through disclosure by Kaiser. Ibid.
Because the evidence and the inferences which could be drawn therefrom presented a jury question as to whether the formula for ACFS constituted a trade secret, we hold that the trial court erred when he granted defendants' motion pursuant to R. 4:37-2(b). Accordingly, we reverse the trial court's determination that there was no trade secret and remand that matter for determination by a jury.
[The court here addressed other issues not germane to trade secret.]
NOTES
[1] Plaintiff Sun Graphic entered into a consent order under which its claims were voluntarily dismissed.