**D & N PROPERTY MANAGEMENT & DEVELOPMENT CORPORATION, INC. d/b/a D & N MANAGEMENT CORPORATION, INC., Plaintiffs,**

v.

**THE COPELAND COMPANIES Defendants.**

No. 99 CIV. 11440(CM).

United States District Court, S.D. New York.

Jan. 5, 2001.

Frank P. Allegretti, Rye, NY, for Plaintiffs.

Kevin J. McKenna, Newark, NJ, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff D & N Property Management & Development Corporation, Inc. ("D & N") brings an action against defendant The Copeland Companies ("Copeland") for breach of contract. Defendant counterclaims for intentional interference with contractual or business relations; intentional interference with prospective contractual or business relations; and unfair competition. Both parties move for partial summary judgment on the breach of contract claim, and plaintiff moves for summary judgment on defendant's counterclaims. For the reasons stated below, I grant plaintiff's motion for summary judgment, with damages to abide trial, and deny plaintiff's motion for summary judgment dismissing the defendant's counterclaims. I also grant defendant's motion for summary judgment dismissing plaintiff's claim for damages arising from defendant's failure to extend D & N's contract.

### FACTS PERTINENT TO THE MOTION

On or about September 19, 1997, D & N and Copeland entered into a written agreement wherein D & N agreed to provide consulting services in connection with

401(k) plans for Copeland. As consideration, Copeland agreed to pay D & N at a daily rate of $831.25 plus transportation expenses. There were no restrictive covenants or non-compete clauses limiting D & N's conduct after the termination of the consulting assignment.

D & N and Copeland reached an oral agreement on May 28, 1998 to extend D & N's consulting assignment with Copeland. Copeland agreed to pay D & N the sum of $875.00 per day through December 31, 1998 and the sum of $945.00 per day from January 1, 1999 through December 31, 1999. D & N sent a letter ("Letter Agreement # 1") dated May 29, 1998 to Copeland, setting forth these terms. (Allegretti Aff. at Exh. 7.)

Copeland altered the agreement by changing the language to limit the duration of the agreement to June 30, 1999, at the rate of $945 per day with the rate pertaining to the second half of 1999 to be determined later. (Id.) D & N accepted Copeland's changes on June 1, 1998 by initialing the amendments, and sending a copy back to Copeland.

Ten days later, for reasons that are not clear (but may stem from D & N's concern about the informality of handwritten changes), D & N sent Copeland a second letter dated June 10, 1998—this one containing all the accepted terms of Letter Agreement # 1 in typewritten form. Notwithstanding the fact that Copeland had already agreed to these terms (indeed, it had proposed some of them), Copeland attempted to amend the terms of the June 10 letter by crossing out the term of the duration of the agreement for the period of "1/1/99 through 6/30/99" and writing "okay through 12/31/98, extension to 1999 to be determined at a later date." (Id. at Exh. 8.) D & N did not indicate any intent to accept Copeland's additional change to the term of the agreement and the parties continued to talk.

On or about June 23, 1998, D & N and Copeland again reached an oral agreement to extend the consulting assignment from January 1, 1999 through December 31, 1999 at a rate of $945.00 per day. D & N memorialized the oral agreement of June 23 in a letter ("Letter Agreement # 2") from Nicholas Mattera, sole employee of D & N, to Copeland. (Allegretti Aff. at Exh. 10.) Copeland countersigned two copies of the letter. In Letter Agreement # 2, Mattera wrote "I appreciate the confidence expressed in me by way of this extension (on a full-time basis), as well as your selection of me to assist with the potential installation of the Sungard system. If this system were chosen, we would need to review the terms of my services for this 2 to 3 year project." (Id.) The SunGard system was a record keeping system that Copeland was contemplating as a replacement for their existing system.

In December of 1998, Copeland attempted to renegotiate the terms of Letter Agreement # 2 for the year 1999, but D & N refused to renegotiate.

On January 15, 1999, Copeland notified Mattera that his consulting services were no longer needed and that he need not report to work on January 18, 1999.

After the termination of the consulting assignment, D & N had communications with different persons, firms and entities in an effort to secure consulting work—including some clients and customers of Copeland who had been designated as "dissatisfied" by Copeland. None of those clients or customers responded affirmatively to D & N's solicitations, except the Trim Corporation of America. The Trim Corporation hired D & N to review and assist in filing a possible claim with the NASD against Copeland. After the claim was filed, D & N had no further contact with Trim.

For the reasons stated below, plaintiff and defendant's motions for partial summary judgment on the breach of contract claim are granted. Plaintiff's motion for summary judgment on defendant's counterclaims is denied.

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement. *See Compagnie Financiere De Cic Et De L'UNION Europeenne, Management Investment Funding Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir.2000). Yet summary judgment is only proper in a contract dispute if the language of the contract is wholly unambiguous. *See id.* (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994)). The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court. *See id.* Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993)). While interpretation of ambiguous contract language generally is a question of fact to be resolved by the factfinder, *see id.*, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide to the contrary." *Id.* (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47).

### 2. *Choice of Law*

In a case where jurisdiction is based on diversity of citizenship, a federal court applies the conflict of law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In *Brink's Ltd. v. South African Airways*, 93 F.3d 1022 (2d Cir.1996), the Court of Appeals for the Second Circuit explained the approach used by New York courts:

> In contract cases, New York courts now apply a 'center of gravity' or 'grouping of contacts' approach. Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. New York courts may also consider public policy 'where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests.' The traditional choice of laws factors, the places of contracting and performance, are given the heaviest weight in this analysis.

*Id.* at 1030–31 (citation omitted). The parties agree that New Jersey has the most significant contacts in this case because

Copeland's main office is in East Brunswick, New Jersey; the initial consulting contract was negotiated and executed wholly within New Jersey; and D & N provided consulting services for Copeland at the main offices in New Jersey for fifteen months. The application of New Jersey law is appropriate under these circumstances.

### 3. Breach of Contract

██ Under New Jersey law, a contract is formed when there is offer and acceptance and terms sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty. *See Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280 (1992). The contract is enforceable if the parties agree on essential terms and manifest an intention to be bound by those terms. *See id.* An essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or a trier of fact to ascertain what the promissor undertook to do. *See Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bk.,* 163 N.J.Super. 463, 474, 395 A.2d 222, 227 (1978) (citing Williston, Contracts (3d ed.1957)).

a. *Plaintiff is Entitled to Summary Judgment of Liability Under Letter Agreement # 2*

██ Plaintiff has moved for partial summary judgment declaring that defendant has breached Letter Agreement # 2. Plaintiff's motion is granted.

A plain reading of Letter Agreement # 2 provides that defendant will pay plaintiff a per day fee for consulting services from January 1 to December 31, 1999, and notes the possibility of revising the terms if installation of the SunGard system were to become a reality.

Letter Agreement # 2 was an extension of prior agreements entered into between D & N and Copeland. It confirmed that D & N would be paid $875 per day through December 31, 1998, and then $945 per day from January 1 to December 31, 1999. In the letter, Mattera refers to his appreciation of "the confidence expressed in me by way of this extension (*on a full time basis*) ..." (June Agreement, Allegretti Aff. At Exh. 10.) (emphasis added). Looking at the language of the contract, it is apparent that D & N was to be paid a daily rate of $945 during the entire calendar year 1999. This is an enforceable contract— and defendant is liable to the plaintiff for the value of his services, at a rate of $945 per day on a full time basis for the year beginning January 1, and ending December 31, 1999.

██ What is not clear, however, is the number of days that plaintiff was expected to work in order to serve "on a full time basis." The "full time" provision is capable of more than one meaning by a reasonably intelligent person. *See Compagnie Financiere,* at 157–58 (2d Cir.2000). It could mean every week for five or seven days a week. Or, it could mean "full time" during the days when D & N's services were specifically needed, or in accordance with past practices. Accordingly, while this court finds that there existed a valid contract for consulting services for calendar year 1999, a jury should consider the meaning of "full time basis" for the purpose of assessing damages to the plaintiff.

b. *Defendant is Entitled to Summary Judgment Dismissing Plaintiff's Claims Regarding the SunGard Extension*

██ Plaintiff is seeking enforcement of the provision in Letter Agreement # 2 that provides that D & N will be hired for 2–3 years in the event that Copeland were to decide to implement the SunGard system. Defendant argues that these terms were insufficiently definite to create a binding contract between the parties. Defendant is correct.

There is significant ambiguity in the portion of the June Agreement dealing

with the SunGard installation. The language in Letter Agreement # 2 pertaining to SunGard states in its entirety: "I [Mattera] appreciate the confidence expressed in me by way of this extension (on a full time basis), as well as your selection of me *to assist with the potential* installation of the Sungard system. *If this system were chosen, we would need to review the terms of my services for this 2 to 3 year project."* (Letter Agreement # 2.) (emphasis added)

Mattera was hired to help evaluate Sun-Gard, but Copeland made no commitment to install SunGard or to hire D & N if it chose to replace its existing system. Mattera drafted the agreement language that is being construed against him—language that specifically provides for a contract term of 1.5 years, but makes no guarantees for a 2–3 year extension for SunGard implementation.

The conditional language of this portion of the contract is not legally enforceable, in that it does not allow a trier of fact to ascertain what it was the promissor undertook to do. *See Malaker,* 163 N.J.Super. at 474, 395 A.2d 222. A purported agreement "so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one." *Id.*

■ Courts applying New Jersey law have found agreements too vague for enforcement where they lacked terms clearly setting the price (or compensation) and/or duration of performance. *See Bergin v. Century 21 Real Estate Corp.,* No. CIV.A. 98–8075, 2000 WL 223833 (S.D.N.Y. Feb. 25, 2000). Applying New Jersey law, the court in *Bergin* considered plaintiff's claims that Century 21 had made use, without compensating him, of an idea for an advertising campaign he had pitched to them. Plaintiff alleged that the contract between him and Century 21 was that if Century 21 "liked" the proposal, Century 21 would purchase it. *See id.* at *5. Instead of purchasing the idea from Bergin, plaintiff charges that Century 21 disclosed the idea to a competitor advertising agency, and then bought the idea from the competitor. *See id.* at *3. The court found that the parties plainly did not enter into a contract. *See id.* at *4. "[T]he amount of compensation, the 'price term,' is an essential term of any contract.... In the absence of an agreement as to the manner or method of determining compensation the purported agreement is invalid." *Id.* (citations omitted).

As in *Bergin,* the price term in the case at bar is similarly nonexistent. The language referred to by the plaintiff specifically states that "[i]f this System were chosen, we would need to review the terms of my services for this 2 to 3 year project." Rather than setting forth a revised fee in the event SunGard were implemented, this contract indicates the parties' intent to renegotiate that term at a later date, should Copeland choose to install the SunGard system. Therefore, on its face, the parties did not reach a meeting of the minds on the essential terms of price and duration with respect to the purported SunGard extension—in marked contrast to the express terms for January 1 to December 31, 1999.

■ To the extent that plaintiff alleges the provision of Letter Agreement # 2 promising to "review the terms" of his services was an attempt to memorialize some prior oral agreement, Mattera's deposition testimony suggests that the oral agreement was also insufficiently definite to create an enforceable contract.[1] Ac-

---

1. Q: Let me try it this way: What do you recall discussing with Mr. Cody about Sun-Gard as it related to your consulting services to Copeland during the first half of 1998?

A: Well, like I said, Win thought I would be a good person to be involved, you know, with the installation of SunGard.
Q: How do you know that?
A: He told me that.
Q: Is there any particular reason why as far as what Mr. Cody told you?

cording to Mattera himself, there were no price terms, and there was no definite time frame for performance. The only evidence to the contrary is Mattera's later affidavit, in which he says that:

> I was assured by Mr. Cody that if Sun-Gard was installed I would be compensated at least what I was then earning at the time SunGard was being initially installed and that it would be subject to their budget. I did not insert a dollar amount of compensation, due in part to what Mr. Cody advised me that depending upon what I was then earning when SunGard was being initially installed that I would earn at least that amount and possibly more depending on Copeland's budget at that time. That is why we agreed to review the terms of the contract.

(Mattera Aff., July 26, 2000 at ¶ 6.)

Even these statements are insufficiently definite to establish a "meeting of the minds" for there to be an enforceable agreement regarding SunGard. There was no specified price term; no definite period of time; and clearly no guarantee that Copeland would even pursue the Sun-Gard system at all. Thus, defendant is entitled to partial summary judgment dismissing plaintiff's claim for breach of contract for the installation of the SunGard extension.

### 4. *Defendant's Counterclaims*

#### a. *Malicious Interference With Contractual Relations*

The elements of the tort of malicious interference with contractual relations are (1) actual interference with a contract plus (2) proof of the malicious nature of that interference. *See Norwood Easthill Associates v. Norwood Easthill*

*Watch,* 222 N.J.Super. 378, 384, 536 A.2d 1317, 1320 (1988) (citing *Raymond v. Cregar,* 38 N.J. 472, 479–80, 185 A.2d 856 (1962)). Interference with contracts is "imposed upon a defendant who intentionally and improperly interferes with the plaintiff's right to a contract with another person ... (or with) the plaintiff's prospects of economic gain even where these prospects have not been reduced to a contract right." *Bard v. Wordtronics,* 235 N.J.Super. 168, 171–72, 561 A.2d 694, 696 (1989) (quoting Prosser & Keeton, Torts (5th ed.1984)). "Malice in the legal sense is the intentional doing of a wrongful act without justification or excuse." *Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 181, 72 A.2d 197, 203 (1950).

As cited in *Bard,* the Second Restatement of Torts § 768 sets forth the parameters within which a competitor may compete:

> Competition as Proper or Improper Interference
>
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

*Bard,* 235 N.J.Super. at 172, 561 A.2d 694.

In *Bard,* plaintiff and defendant were both in the business of marketing vascular

---

A: I guess just what I knew about the current system that was there, working knowledge of 401(k) plans and how they operate.
Q: Prior to the date of [Letter Agreement # 2], what else, if anything, did Mr. Cody tell you about the SunGard system as it

related to your consulting services to Copeland?
A: Outside of that conversation, I don't recall anything else.
(Allegretti Aff. at Exh. 3 (Mattera Dep.) at 333–34.)

grafts, but neither had complied with a new FDA rule requiring all manufacturers of vascular grafts to be approved or exempted by the FDA. At issue was a letter sent out by defendant Meadox (by means of an "independent" third party) to health care providers to inform them that there was no currently marketed vascular graft approved by the FDA. After receiving the letter, numerous medical-care providers either returned their store of vascular grafts to the plaintiff or cancelled their existing orders. *See id.* at 171, 561 A.2d 694. Applying the Restatement § 768, the court concluded that the plaintiff and defendant were competitors; the letter was distributed for the purpose of advancing the interest of defendant; and defendant's action neither created nor constituted an unlawful restraint of trade. *See id.* The court similarly refused to consider defendant's actions to have employed unlawful means: "Its motive was to compete, i.e. to induce users of the vascular grafts to purchase the device from the Meadox Company, rather than from plaintiff. A competitor has an absolute right to take away as much of the 'other fellow's' business as he can lawfully." *See id.* at 173, 561 A.2d 694.

In the case at bar, there is at least a question as to whether D & N and Copeland are competitors. D & N is in the business of providing consulting services specializing in 401(k) operations. D & N was hired by Copeland to assist in converting 401(k) plans, and to process payments to plan participants. Copeland, on the other hand, does the record keeping for companies who have 401(k) plans for their employees. Copeland bills itself as "dedicated to providing state-of-the-art retirement planning products and services to not-for-profit organizations in the health-care, government and education markets, as well as 401(k) plans for for-profit employers." *See* The Copeland Companies, at *www.copeland.com/II/II.htm* (last visited Jan. 4, 2001).

■ The remaining question is whether D & N acted by wrongful means.

New Jersey courts have explained that there is no "rule of thumb" to determine what amounts to wrongful means. *See Bard,* 235 N.J.Super. at 175, 561 A.2d 694. But where it appears to a court "from sufficient facts and the legitimate inference therefrom, that the elements of the tort may be present, including conduct which was both injurious and transgressive of generally accepted standards of common morality or of law, it is then for the jury or the fact finder to determine the issue." *Id.* at 175, 561 A.2d 694 (quoting *Leslie Blau Co. v. Alfieri,* 157 N.J.Super. 173, 187, 384 A.2d 859 (1978)). If unlawful means are employed, such as fraud or intimidation, or if the means consist of acting without justifiable cause (malice) so that a person suffers injury to his business, he may secure redress for his damage. *Leslie Blau,* 157 N.J.Super. at 185, 384 A.2d 859. An act arising from sheer malice will create liability—but if the act was motivated by a desire to enhance a financial position for profit, then for a defendant to be liable, his conduct must have been "a violation of standards of 'socially acceptable conduct.'" *Id.* (citation omitted).

A sample letter sent by Mattera to Copeland clients on the "dissatisfied list" is the following to Ms. Diane Hickman, of Mouton & Long Architects:

Dear Ms. Hickman,

I am writing you as way of introduction to my company, D & N Management Corporation. I just recently completed a 15–month consulting assignment at the Copeland Companies, working primarily in their 401(k) operations area. During my tenure there, I reviewed all aspects of this operation, from the converting of plans to the processing of payments to plan participants. I have enclosed a copy of my resume for your review.

I know of your frustrations with Copeland regarding the processing of your plan. I am currently working with other Copeland client's [sic] regarding simi-

lar issues. I know of at least one that has decided to file a claim with the NASD (National Association of Securities Dealers) due to Copeland's lack of investing contributions in a timely manner. The NASD is an association that governs the practices of broker's [sic] across the county [sic]. They have the power to award monetary settlements if they find the broker acted in a manner which was not in the best interest of the investor.

I know that my 20+ years experience in the benefits area, and the past 15 months I spent at Copeland is the correct formula to resolving the problems you are experiencing. I hope to hear from you soon regarding this matter, and look forward to working with you to resolve the issues you have with Copeland.

Sincerely, Nicholas J. Mattera, President and CEO

(Allegretti Aff. at Exh. 14.)

D & N approached Copeland's customers by sending letters like the one above that offered to assist with problems related to Copeland's failure to perform on existing contracts. It is apparent from the record that Copeland had existing contracts with several of the companies approached by D & N, but whether they were terminable at-will is not evident. *See Bard*, 235 N.J.Super. at 172, 561 A.2d 694. This cannot fairly be said to "concern a matter involved in the competition" between Copeland and D & N, *see id.*, nor does it advance D & N's interest in competing with Copeland. *See id.* Indeed, it served to advance D & N's interests of approaching potential consulting clients, but not relative to Copeland, which was not in the business of providing similar services.

The evidence suggests that at least one client—The Trim Corporation of America—hired D & N to file a complaint against Copeland. This court does not view assisting The Trim Corporation in filing an NASD action against Copeland as an attempt by D & N simply to compete with Copeland for Trim's business. *See id.* Whether D & N's letter to Copeland's dissatisfied clients, referring to their dissatisfaction as well as Trim's NASD action, was done with malice raises a question of fact as to whether D & N transgressed the standards of socially acceptable conduct. *See Leslie Blau*, 157 N.J.Super. at 185, 384 A.2d 859. Therefore, plaintiff's motion for summary judgment is denied.

b. *Tortious Interference with Prospective Economic or Contractual Relationship*

 Copeland's factual basis for interposing this claim is the same as the tortious interference with a contractual relationship claim.

 To establish a cause of action for tortious interference with a prospective contractual or business relations, plaintiff must allege: (1) a reasonable expectation of economic advantage; (2) that the interference and harm afflicted were done intentionally and with "malice"; (3) facts leading to the conclusion that the interference caused the loss of the prospective gain; and (4) the injury caused damage. *See Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751, 563 A.2d 31 (1989). *See id.* What is actionable is "the luring away, by devious, improper and unrighteous means, of the customer of another." *Id.* at 750, 563 A.2d 31. Malice is defined as inflicting harm without justification or excuse. *See id.* Indeed, there can be actionable interference even when there is no enforceable contract. *See id.*

D & N sent letters to a significant number of Copeland's clients whom Copeland had classified as "dissatisfied." D & N expressed an awareness in its communications that the client was dissatisfied with Copeland's provision of services. As with the tortious interference with contractual relations claim, there exist disputed facts as to whether D & N acted with malice, and whether D & N injured Copeland by

keeping it from securing prospective business. Summary judgment is therefore denied, and the question will be left for a jury.

c. *Misappropriation of Trade Secrets*

 The Supreme Court of New Jersey in *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 257, 108 A.2d 442 (1954), has defined trade secrets as consisting of a "compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. Its subject matter must not be a matter of public knowledge or of general knowledge within the industry." *Id.*

Although it is impossible to categorize all acts which constitute unfair competition, there are a few fundamental elements that are definite. In essence, unfair competition is a business tort. Generally it consists of the misappropriation of one's property by another—property that has some sort of commercial or pecuniary value. *Columbia Broadcasting System v. Melody Recordings*, 134 N.J.Super. 368, 377–378, 341 A.2d 348 (1975).

As cited in *Apollo Tech. Corp. v. Centrosphere Indus. Corp.*, 805 F.Supp. 1157, 1200 (D.N.J.1992), the Second Restatement of Agency 396 provides that:

Unless otherwise agreed, after the termination of the agency, the agent:

(a) has no duty not to compete with the principal;

(b) has a duty to the principal *not to use* or to disclose to third persons, *on his own account* or on account of others, in competition with the principal or to his injury, trade secrets, *written lists of names*, or other similar *confidential matters given to him only for the principal's use or acquired by the agent in violation of duty*. The agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent;

(c) has a duty to account for profits made by the sale or use of trade secrets and other confidential information, whether or not in competition with the principal;

(d) has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation.

*Id.* (emphasis added)

Plaintiff alleges that the names on the lists were a matter of public knowledge, easily ascertainable by review of Copeland's IRS forms. Defendant argues that the specific names on the "dissatisfied list" were private, and generated for internal use only. There exist disputed facts as to whether D & N usurped, on its own account, a written list of names that was provided to D & N for use only in the context of D & N's performance of consulting services to Copeland. Plaintiff's motion for summary judgment on this claim is therefore also denied.

This constitutes the decision and order of the court.